# Case No. 18,272.

## CHARGE TO GRAND JURY—TREASON.

### [1 Bond, 609.] 1

### Circuit Court, S. D. Ohio. Oct., 1861.

TREASON AGAINST UNITED STATES—CONSTITUTIONAL DEFINITION—ACTS COVERED THEREBY—CONSPIRACY TO OVERTHROW GOVERNMENT—RECRUITING INSURRECTIONARY FORCES.

[1. To be employed in actual service in an army raised to oppose the government in its action, or directly or indirectly to aid or assist in the levying or embodying of a military force for the subversion of the government, are plainly acts of "levying war," and involve the commission of the crime of treason The constitutional definition of treason, however, is of broader signification, and includes all those who join a hostile army after war is begun.]

[2. Treason may be predicated of acts which are not a direct levying of war. The words "adhering to their enemies, giving them aid and comfort," include in general, any act committed after war actually exists which indicates a want of loyalty to the government and sympathy with its enemies, and which, by fair construction, is directly in furtherance of their hostile designs. If this be the natural effect of the act, though prompted solely by the expectation of pecuniary gain, it is treasonable in character.]

[3. Thus, after war actually exists, it is treasonable to sell to, or provide arms or munitions of war, or military stores and supplies, including food, clothing, etc., for the use of. the enemy; to hire, sell, or furnish boats, railroad cars, or other means of transportation, or to advance money or obtain credits for the use and support of the hostile army; and to communicate intelligence to the enemy by letter, telegraph, or otherwise, relating to the strength, movements, or position of the army.]

[4. The meaning of the words "overt act" as used in the constitutional definition of treason and in the statute, is an act of a character susceptible of clear proof, and not resting in mere inference or conjecture. They were intended to exclude the possibility of a conviction upon proof of facts which were only treasonable by construction or inference, or which had no better foundation than mere suspicion.]

[5. Mere expressions of opinion indicative of sympathy with the public enemy, though sufficient to justify a strong feeling of indignation against the individual, and the suspicion that he is at heart a traitor, are not sufficient, under the constitution and laws, to warrant a conviction of treason.]

[6. The act of August 6, 1861 (12 Stat. 317), making it a high misdemeanor to recruit soldiers or sailors in any state or territory to engage in armed hostility against the United States, or to open a recruiting station for the enlistment of such persons, was intended to reach acts not deemed treasonable under the statute of 1790.]

1 [Reprinted by permission.]

[7. The act of July 31, 1861 (12 Stat. 284), making it a high crime to conspire to overthrow or destroy by force the government of the United States, or to levy war against the United States, or oppose by force their authority, or to do certain other acts therein specified, was designed to punish the mere act of conspiring, which, under the constitutional definition and the act of 1790, do not involve the crime of treason, unless there is an attempt to consummate the treasonable act.]

LEAVITT, District Judge (charging grand jury). You have been summoned and sworn as a grand jury of the United States for the Southern district of Ohio; and, according to the tenor of the oath you have just taken, it will be your duty to inquire into all crimes against the laws of the United States committed within the district; and, upon sufficient evidence, to return bills of indictment against the persons accused. It is not necessary, on this occasion, that I should refer specially to all the crimes and offenses defined and punished by the various acts of congress, and which are properly within your cognizance as a grand jury. I shall therefore notice such only as you will in all probability be called upon to investigate in the proper discharge of your duties. Among these, I am informed, there will be some involving the charge of treason against the United States.

The constitution declares that "treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort," and that "no person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court." The act of congress of April 30, 1790 [1 Stat. 112], adopts the words of the constitution in defining the crime, and declares that on conviction in accordance therewith the punishment shall be death. Neither the constitution nor the act of congress specifies the precise acts which shall constitute the crime. As it would be impossible for any human intellect to foresee all the circumstances under which it might be committed, the framers of the constitution and of the statute wisely determined not to attempt such a specification. It was, therefore, a necessity that something should be left to the discretion of courts and judges, in determining what facts shall constitute treason. There is, however, a salutary limitation to the exercise of their discretion in the provision that there can be no conviction unless on the public confession of the accused party, made in court, or by the evidence of two witnesses to the same overt act of treason. The object of the provision is to prevent the probability of a conviction for a mere constructive treason. In the earlier periods of English history, the judges were often the pliant tools of the king, and exercised the power of punishing for constructive treasons, under circumstances the most revolting and greatly to the oppression of innocent persons. The wise and sagacious framers of our constitution have effectually guarded against such abuses of power, by declaring there shall be no conviction for this high crime on mere suspicion or on proof of any fact which is not an overt act of treason established by two witnesses. This provision applies as well to the legislative as to the judicial department of the government, and an act of congress, therefore, in conflict with it would be a nullity.

It would be a vain effort to attempt to designate every act, which, in its legal import, would be levying war against the government, or giving aid and comfort to the public enemy after a war is actually begun. Under the first division of the constitutional definition of treason, there are some acts, the treasonable character of which is apparent to the mental consciousness of every one. To be employed in actual service in an army raised to oppose the government in its action, or directly or indirectly to aid or assist in the levying or embodying a military force for the subversion of

the government, are plainly acts of levying war, and involve the commission of the crime of treason in its most aggravated form. But the words referred to have a broader signification. As remarked by Chief Justice Marshall, in the trial of Burr, those who join the hostile army after the war is begun, are equally guilty of levying war within the meaning of the constitution and the act of congress. That learned judge states the law in these words: "If a body of men be actually assembled for the purpose of effecting by force a treasonable purpose, all, those who perform any part, however minute, or however remote from the scene of action, and who are in the general conspiracy, are to be considered as traitors." [Case No. 14,693.]

But without stopping to specify more fully what acts may be understood as a direct levying of war, I will notice briefly what are included in the words, "adhering to the enemies of the United States, giving them aid and comfort." This language leaves no room to doubt, that treason may be predicated of acts, which are not a direct levying of war according to the construction of that phrase, as just indicated. The words in the definition, "adhering to their enemies," seem to have no special significance, as the substance is found in the words which follow—"giving them aid and comfort." As before remarked, it is not an easy task to classify or specify the acts, which bring a party within the range of this branch of the definition. In general, when war exists, any act clearly indicating a want of loyalty to the government, and sympathy with its enemies, and which, by fair construction, is directly in furtherance of their hostile designs, gives them aid and comfort. Or, if this be the natural effect of the act, though prompted solely by the expectation of pecuniary gain, it is treasonable in its character. Without going into details on the subject, I will briefly notice some things clearly involving the guilt of treason. Thus, to sell to, or provide arms or munitions of war, or military stores, or supplies, including food, clothing, etc., for the use of the enemy, is within the penalty of the statute. And to hire, sell, or furnish boats, railroad cars, or other means of transportation, or to advance money, or obtain credits, for the use and support of a hostile army, is treasonable. It is equally clear that the communication of intelligence to the enemy, by letter, telegraph, or otherwise, relating to the strength, movements, or position of the army, is an act of treason. These acts, thus briefly noted, show unequivocally an adherence to the enemy, and an unlawful purpose of giving him aid and comfort.

It has been already noticed, that to justify a conviction for treason, unless the crime is confessed in open court, there must be the evidence of two witnesses to an overt act. The plain meaning of the words "overt act," as used in the constitution and the statute, is an act of a character susceptible of clear proof, and not resting in mere inference or conjecture. They were intended to exclude the possibility of a conviction of the odious crime of treason, upon proof of facts which were only treasonable by construction or inference, or which have no better foundation than mere suspicion. In its benign caution on this subject, the law requires not only proof of a treasonable act, but that it should be established by the oaths of two witnesses. Hence, it will be obvious that however strong may be the grounds of suspicion or belief, that an individual is disloyal to his country or his government, until his disloyalty is developed by some open and provable act, he is not legally guilty of the crime of treason. And it follows, also, that mere expressions of opinion indicative of sympathy with the public enemy, will not ordinarily involve the legal guilt of that crime. They may well justify a strong feeling of indignation against the individual, and the suspicion that he is, at heart, a traitor, but will not be a sufficient basis for

his conviction in a court of law. Whether, on the principle of self-preservation in times of great public danger, the summary arrest of such a person, under the military authority of the government, may not be both necessary and proper, is a different question, not in any way connected with the discharge of your duties as grand jurors. There may be circumstances justifying the exercise of such a power as a military necessity. But the constitution and laws of the United States are your guides in the performance of your duties. You, as a grand jury, and this court, as a court of the Union, derive all their powers from this source. Neither can willfully overleap the limits prescribed for its action without a sacrifice of integrity and of all claim to the respect and confidence of every right-minded American citizen.

Without detaining you by any further exposition of the law of treason, I will call your attention to the offense of misprision of treason, defined and punished by section 2 of the act of 1790. This section provides, in substance, that if any person having knowledge of the commission of an act of treason shall conceal it, or not make it promptly known to the proper authority, he shall be liable to punishment by fine and imprisonment. The section is so clear in its terms as to render any comment unnecessary. It will be obvious to you that the concealment of treason may involve the most serious consequences to the public, and, on sufficient proof, should be visited with the severest penalty of the law.

It is my duty also to call your attention to two other acts of congress, passed at the recent special session of that body, the provisions of which have some connection with the present state of our national affairs. The first to which I shall refer is the act approved August 6, 1861, which provides, "that if any person shall be guilty of the act of recruiting soldiers or sailors in any state or territory of the United States, to engage in armed hostility against the United States, or who shall open a recruiting station for the enlistment of such persons, either as regulars or volunteers as aforesaid, he shall be guilty of a high misdemeanor, and upon conviction in any court of record, having jurisdiction of the offense, shall be fined a sum not less than two hundred dollars, nor more than one thousand dollars, and confined and imprisoned for a period not less than one year nor more than five years." The second section subjects the person enlisted to a fine of one hundred dollars and to imprisonment, not less than one year nor more than three years. In reference to this statute, I may remark, it seems to have been the view of the congress by which it was enacted, that recruiting or enlisting soldiers or sailors for the service of the enemy, or opening a recruiting station for that purpose, or the act of being enlisted, were not treasonable within the law of 1790, and that further legislation was therefore needed to warrant their punishment.

It is also proper to call the attention of the grand jury to another statute, approved the 31st of July last, "to define and punish certain conspiracies." This statute has but one section, which provides, "that if two or more persons within any state or territory of the United States shall conspire together to overthrow or put down, or to destroy by force, the government of the United States, or to levy war against the United States, or to oppose by force the authority of the government of the United States; or by force to prevent, hinder, or delay the execution of any law of the United States; or by force to seize, take, or possess any property of the United States, against the will or contrary to the authority of the United States; or by force, or intimidation, or threat to prevent any person from accepting or holding any office of trust or place of confidence, under the United States; each and every person so offending shall be guilty of a high crime." The

punishment is by fine not less than five hundred and not more than five thousand dollars. or by imprisonment not less than six months nor more than six years, or by both fine and imprisonment. The jury will notice that this statute punishes a conspiracy by two or more, to do any of the unlawful acts which it specifies. Under the act of 1790, defining and punishing treason, it has been held by the courts, that to conspire to overthrow the government, or to do any hostile act against it, did not invoke the crime of treason, unless there was an attempt to consummate the treasonable act. Hence the necessity of the late statute, to meet the case of a treasonable conspiracy. And it is perhaps to be regretted that this provision had not been a part of the act of 1790. With such a provision of law, properly enforced, there is reason to believe many persons who have been prominent in our national affairs, and once high in the confidence of the people, would have been the subjects of its penalties; and thus the great rebellion now in progress may have been prevented.

It may also be worthy of the notice of the grand jury, that by the act just referred to, it is declared to be a crime to conspire "by force to prevent, hinder, or delay the execution of any law of the United States." For many years a law has been in force, affixing punishment to any forcible opposition to the execution of an act of congress, but a mere conspiracy for that purpose was not criminal until the passage of the act of last July. There can be but little doubt, that if the provisions referred to had been earlier in force, it would have subjected to deserved punishment some individuals who were parties to unlawful conspiracies, but who directly avoided any active participation in executing their purposes, and who were not therefore within the reach of the law.

It does not occur to me that there are any other statutory provisions, having any direct bearing on the present state of our national affairs, or your duties in connection with the conflict now in progress, to which it is necessary to call your attention. It is a time when grand jurors should be vigilant and faithful in the discharge of their duties. Every loyal citizen, whatever may be his position or place in the community, is required to stand up fearlessly in defense of the government. It can not be disguised or concealed that our once happy and united country is encompassed by perils that must excite the deep solicitude of every patriotic heart. We are called upon to confront and put down a rebellion of formidable aspect and dimensions, and which for the unmitigated atrocity of its designs, and the madness and infatuation of those who began, and are now engaged in it, has no parallel in history. Its object is no less than the total subversion of a government devised and founded by the far-reaching wisdom of our fathers, in every part of the structure of which they have legibly inscribed their deep devotion to the great principles of constitutional liberty, and evinced a philanthropy co-extensive with the whole human race. And rightly administered, the constitution they have given us is suited to promote, beyond any ever devised by mere human intelligence, the happiness and prosperity of those who live under its benign sway. It is truly gratifying to know that among the citizens of the loyal states, as also in the minds of many of those now in rebellion, there is a prevalent conviction that the preservation of a government founded in such a spirit and for such exalted purposes is worth every conceivable sacrifice. And there is the most unmistakable indications of an unalterable determination to perpetuate it, in its integrity and purity, at every hazard. With this wide-spread and elevated patriotic feeling, and steadfast devotion to the Union, we are hopeful for the future of our country. We may

meet with reverses, and be called upon to endure many fiery trials, but we can not doubt that these will be met with heroic firmness and a unity of purpose altogether invincible. There is nothing extravagant in the belief that, though dark clouds now hang upon our horizon, we may look forward to a time when the present rebellion shall be effectually suppressed, and the government ordained and established by our patriotic fathers shall come out of the conflict, not only uninjured, but strengthened and purified by the trial to which it has been subjected, and with an increased capacity for extending and multiplying the blessing it has already so largely conferred. But the occasion is not suitable for an extended discussion of our national affairs. I have adverted thus briefly to the subject for the sole purpose of reminding you of the solemn responsibility resting on you as grand jurors, in the present crisis of the country, and of exhorting you to a careful inquiry into any charges which may be brought to your notice, involving the crime of treason or any of the kindred offenses to which I have referred. I shall not detain you with a reference to the specific accusations which you may be required to investigate. While in the discharge of your duties you will be impressed with the necessity of due vigilance; it will be equally obvious to you that you should act with a proper measure of caution and deliberation. Treason is justly considered the highest crime against society. Having for its object an assault by violence on the government, and thus to effect its overthrow, it may imperil the happiness and lives of millions. The crime is, therefore, odious in the view of those who are thus liable to suffer as the result of its perpetration. The mere suspicion of guilt often brings down upon its object a strong feeling of public indignation, attended perhaps with the most serious consequences to the suspected person. Such results are not uncommon when there is a high state of excitement in a community. Facts may be misrepresented, or so distorted, as to induce this suspicion without any real cause; or a vindictive personal enemy may fabricate statements to the prejudice of another for the base purpose of bringing odium upon him. Thus, it may happen that a citizen of the purest character, and the most patriotic heart, may be a grievous sufferer. Let me, therefore, suggest to the grand jury, that in their investigation of charges involving the high crime of treason, they should carefully exclude from their minds all influences originating in mere popular excitement or which may be supposed to be the result of personal enmity. If, after a calm inquiry into the facts, the jury believe that the accused person is guilty of treason, they ought not to hesitate in returning a bill according to their convictions, whatever may be the result to the party implicated. But in regard to treason, and indeed all other crimes, the jury should reach a rational conclusion, from the law and the evidence, that the person accused is guilty, before returning a true bill against him.

A grand jury has only the evidence which the government can adduce, without reference to what the defendant may have it in his power to bring forward, in proof of his innocence. They ought, therefore, to be able to say under the solemnity of their oaths, that there is reasonable ground for the inference of guilt. And, as before intimated as to all crimes, it must appear that the act charged was committed within the limits of the Southern district of Ohio. If treason is the crime charged, there must be a distinct allegation in the indictment of the overt act or acts; and although a grand jury return a true bill for this crime, there can be no conviction unless an overt act is proved by two witnesses. And it may well be doubted, whether it is expedient to indict for this crime in cases where it is certain the evidence re-

quired by law can not be produced before a traverse jury, and where consequently there can be no conviction.