# Case No. 18,271.

## CHARGE TO GRAND JURY — TREASON.

### [5 Blatchf. 549.] [1]

Circuit Court, S. D. New York.　Nov. 4, 1861.

#### THE LAW OF TREASON.

1. To constitute the crime of treason, in levying war against the United States, as defined in article 3, § 3, of the constitution, there must be an actual levying of war. A consultation or conspiracy to do so is not an overt act, within the constitutional definition.

2. What acts constitute adhering to the enemies of the United States, giving them aid and comfort, within article 3, § 3, of the constitution, considered.

3. Words, oral, written or printed, however treasonable, seditious or criminal of themselves, do not constitute an overt act of treason.

4. The extent to which the fact of the use of such words may be used, in finding an indictment, or on the trial of it, considered.

5. There is no law of the United States making the use of treasonable words an offence.

6. In a civil war, persons who adhere to their allegiance, are not, although they reside in an insurrectionary district, regarded as enemies; and trade with such persons in good faith and without collusion with the enemy, is lawful, unless interdicted by the government.

7. The provisions of the act of July 13, 1861 (12 Stat. 255), in regard to trade with territory in insurrection, explained, as bearing on the subject of treason.

NELSON, Circuit Justice, in charging the grand jury, after instructing them in regard to several cases to be brought before them, proceeded as follows:

The unhappy condition of our country, arising out of the unnatural struggle of the people of a portion of the Union to overthrow their government, has created new relations among, and imposed new duties upon the citizens, which have brought into operation crimes and guilt that, to the great credit of the country, have heretofore been rare; indeed, I may say,

---

[2] [From 23 Law Rep. 597.]

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

almost unknown to her laws and judicial tribunals. I refer to the crime of treason against the United States. Although no case of this description has been presented by the district-attorney to be specially submitted to you, it may not be out of place to call your attention, in a general way, to the elements constituting this offence. It is the highest crime known to society, and was deemed by the founders of our government of such importance, both in respect to the government and the citizen, that they specially defined it in the constitution; thus, taking it out of the power of legislative regulation. The definition is found in the third section of the third article, as follows: "Treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court." The power to annex the punishment was left to congress, which annexed the penalty of death. This definition of the crime was taken from the statute of 25 Edw. III. of England, and which has been several times reaffirmed, for the purpose of correcting abuses that had grown up in that kingdom in respect to the law, both by acts of parliament and the decisions of courts, under the tyrannical reigns of the Tudors and the Stuarts. Those abuses were well known to the founders of our government, and doubtless led to the peculiar phraseology observable in the definition of the crime, namely, that it shall consist only in levying war against the United States, or in adhering to their enemies, giving them aid and comfort; and to the other equally stringent feature, that no person shall be convicted of the offence except on the testimony of two witnesses to the same overt act. The first prohibits congress from making any other act of the citizen than those specified, treason; and the second prevents the introduction of constructive treasons, which had been engrafted upon this statute of Edw. III. by judicial decisions.

Under the first clause of the provision—levying war against the United States—there can be no great difficulty in determining the facts and circumstances which establish the crime. There must be an actual levying of war. A consultation or conspiracy to do so, is not an overt act, within the constitutional definition.

There is more difficulty in determining what constitutes the overt act under the second clause—namely, adhering to the enemy, giving him aid and comfort. Questions arising under this clause must depend very much upon the facts and circumstances of each particular case. There are some acts of the citizen, in his relations with the enemy, which leave no room for doubt—such as, giving intelligence, with intent to aid him in his acts of hostility—sending him provisions or money—furnishing arms, or troops, or munitions of war—surrendering a military post, &c., all with a like intent. These and kindred acts are overt acts of treason, by adhering to the enemy.

Words oral, written or printed, however treasonable, seditious or criminal of themselves, do not constitute an overt act of treason, within the definition of the crime. When spoken, written or printed in relation to an act or acts which, if committed with a treasonable design, might constitute such overt act, they are admissible as evidence tending to characterize it, and to show the intent with which the act was committed. They may also furnish some evidence of the act itself, against the accused. This is the extent to which such publications may be used, either in finding a bill of indictment or on the trial of it. An attempt was made, in the parliament of England, during the reign of James II. to make treasonable words the subject of this crime; but it was resisted by the friends of constitutional liberty and defeated, and since that time it has not been renewed.

Such publications are misdemeanors at common law, indictable, and punishable by fine and imprisonment. But, as there are no common law offences cognizable in the federal courts, unless made so by act of congress, and as congress has passed no act on the subject, this court has no jurisdiction over them. The only act passed by congress on the subject was the act of July 14, 1798 (1 Stat. 596). The second section of that act provided, that if any person should write, print, utter, or publish any false, scandalous and malicious writing, or writings, against the government, or either house of congress, or the president, with intent to defame the government, or either house of congress, or the president, or to bring them or either of them into contempt or disrepute, or to excite against them or either of them the hatred of the people of the United States, or to stir up sedition within the same, or to excite unlawful combinations therein for opposing or resisting any law, or any act of the president done in pursuance thereof, &c., such person, on conviction, should be punished by a fine not exceeding $2,000, and by imprisonment not exceeding two years. The act was a temporary one, and expired on the 3d of March, 1801, by its own limitation, and no similar act has since been passed.

On the breaking out of a war between two nations, the citizens or subjects of the respective belligerents are deemed, by the law of nations, to be the enemies of each other. The same is true, in a qualified sense, in the case of a civil war arising out of an insurrection or rebellion against the mother government. In the latter case, the citizens or subjects residing within the insurrectionary district, not implicated in the rebellion, but adhering to their allegiance, are not enemies, nor to be regarded as such. This distinction was constantly observed by the English government in the disturbances in Scotland, under the Pretender and his son, in the years 1715 and 1745. It modifies the law, as it respects the condition of the citizens or subjects residing within the limits of the revolted district, who remain loyal to the government. As it respects those of two sovereign nations in a state of war, all commercial intercourse between them is forbidden by the law of nations, all contracts are unlawful, and any goods or property, the subjects of the illicit trade, are liable to seizure and confiscation. This is true, also, as it respects the citizens or subjects in revolt and making war upon the mother government. But trade with the loyal portion of the people in the disaffected district, in good faith and without collusion with the enemy, is lawful, unless interdicted by the government. The principle is recognized by the recent act of congress, passed July 13, 1861 (12 Stat. 255). The fifth section provides, that the president, by proclamation, may declare that the inhabitants of a state, or of any part of it, are in a state of insurrection, and, thereupon, all commercial intercourse shall cease between the citizens thereof and the citizens of the rest of the United States, and the goods and merchandise, &c., the subject of the illicit trade, shall be liable to seizure and confiscation. Here, the trade and intercourse are interdicted by the proper authority, and the interdiction applies to the loyal as well as the disloyal citizens or inhabitants. The sixth section goes further, and forfeits any ship or vessel belonging, in whole or in part, to a citizen or inhabitant of the interdicted state or district, found at sea or in any port of the rest of the United States. The forfeiture applies to the loyal as well as the disloyal citizens in the disaffected district, probably, from the difficulty of making the forfeiture practical and complete against the latter without making it general. The government, however, having a general control over the subject, can remedy

any injustice as respects the loyal citizen, by releasing the forfeiture. This section, in terms, forfeits the whole of the vessel if part belongs to the citizens of the disaffected district, and would seem to carry with it any interest in the vessel belonging to citizens of the loyal states. This, however, can hardly have been the intention of congress. Trade with the enemy, as I have already said, according to the law of nations, is forbidden, and, the property engaged in it is liable to forfeiture, as is the trade in the particular cases specified in the act of congress referred to. But, this is all. The act is not made criminal; and, until it is made so by congress, no punishment is annexed to it, except the forfeiture of the goods. But, this interdicted trade may be carried on in such a way as to expose the parties concerned to the crime of treason. If carried on for the purpose and with the intent of giving aid and assistance to the enemy in their hostility against the government, the act would furnish an overt act of adhering to the enemy, giving him aid and comfort. Every citizen therefore, engaged in carrying on this illicit trade, will find a much greater peril accompanying the enterprise than the mere forfeiture of his goods.