## Case No. 15,254.

### UNITED STATES v. GREATHOUSE et al.

[4 Sawy. 457; 2 Abb. U. S. 364.] [1]

Circuit Court, N. D. California.  Oct. 17, 1863.

TREASON — "ENEMIES"—LEVYING WAR — OVERT ACTS—GIVING AID AND COMFORT—LETTER OF MARQUE — PUNISHMENT — INDICTMENT — JURY — DISREGARD OF INSTRUCTIONS.

1. Although juries in criminal trials have the power to disregard the instructions of the court on questions of law, and in case of acquittal their decision is final, yet it is their duty to take the law from the court, and apply it to the facts of the case.

[Cited in U. S. v. Taylor, 11 Fed. 473; Sparf v. U. S., 15 Sup. Ct. 284, 156 U. S. 51, 715.]

[Cited in Territory v. Kee (N. M.) 25 Pac. 926; State v. Burpee, 65 Vt. 3, 25 Atl. 964.]

2. Treason having been defined by the constitution, congress can neither extend nor restrict the crime; its power over the subject is limited to prescribing the punishment.

3. The term "enemies," as used in the constitutional clause defining treason (Const. art. 3, § 3), applies only to subjects of a foreign power in a state of open hostility with us; it does not embrace rebels in insurrection against their own government.

4. To constitute a "levying of war" within the meaning of the constitutional clause defining treason (Const. art. 3, § 3), there must be an assemblage of persons with force and arms to overthrow the government or resist the laws.

5. If war is levied against the United States, all who aid in its prosecution, whether by open hostilities in the field, or by performing any part in the furtherance of the common object, however minute or however remote from the scene of action are guilty of treason.

6. In treason there are no accessories; all who engage in rebellion at any stage of its existence, or who designedly give to it any species of aid and comfort, in whatever part of the country they may be, are principals in the commission of the crime.

7. An indictment under section 2 of the act of July 17, 1862 [12 Stat. 589], need not use the phrase "levying war" specifically; it is sufficient to follow the language of the act.

8. The true construction of the act of July 17, 1862, for the punishment of treason, is that congress intended: 1. To preserve the act of 1790 [1 Stat. 112], which prescribes the death penalty in force for the prosecution and punishment of offenses committed previous to July 17, 1862, unless the parties accused are convicted under the act of the latter date for subsequent offenses; and, 2. To punish treason thereafter committed with death, or fine and imprisonment, in the discretion of the court, unless the treason consists in engaging in or assisting a rebellion or insurrection; in which event, the death penalty is to be abandoned, and a less penalty to be inflicted.

9. The purchase of a vessel, and fitting her up for service with arms and ammunition, and the employment of men to manage it, in pursuance of a design to commit hostilities on the high seas, in aid of an existing rebellion against the United States, are overt acts of treason.

10. It is not essential to constitute giving aid and comfort that the effort to aid should be successful, and actually render assistance. Overt acts, which, if successful, would advance the in-

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 2 Abb. U. S. 364, contains only a partial report.]

terests of the rebellion, amount to aid and comfort.

[Cited in Young v. U. S., 97 U. S. 39.]

11. Belligerent rights conceded to the Confederate States cannot be invoked for the protection of persons entering within the limits of a state which has not seceded, and secretly getting up hostile expeditions against the government.

12. A letter of marque, issued by an insurrectionary government erected by some of the states or the people thereof, in rebellion against the authority of the United States, constitutes no defense to a judicial trial for treason in levying war under such letter, so long as the legislative and executive departments have not recognized the existence of such government, and its authority to issue letters of marque.

[Cited in The Ambrose Light, 25 Fed. 421.]

On the fifteenth day of March, 1863, the schooner J. M. Chapman was seized in the harbor of San Francisco, by the United States revenue officers, while sailing, or about to sail, on a cruise in the service of the Confederate States, against the commerce of the United States; and the leaders of the expedition, consisting of Ridgeley Greathouse, Asbury Harpending, Alfred Rubery, William C. Law, Lorenzo L. Libby, with several others, were indicted, under the act of congress of July 17, 1862, for engaging in, and giving aid and comfort to, the then existing rebellion against the government of the United States.

The indictment alleged in substance: (1) The existence of a rebellion against the United States, their authority and laws; (2) That the defendants traitorously engaged in, and gave aid and comfort to, the same; (3) That in the execution of their treasonable purposes, they procured, fitted out and armed a vessel to cruise in the service of the rebellion, on the high seas, and commit hostilities against the citizens, property and vessels of the United States; and that the vessel sailed on such cruise.

The cause came on for trial at the October term of 1863. A nolle prosequi was entered as to Law and Libby, and they became witnesses for the prosecution. The trial lasted several weeks. The testimony showed that Harpending, a native of Kentucky, and Rubery, a native of England, had for some time contemplated the fitting out of a privateer at San Francisco, for the purpose of taking several of the mail steamships plying between that port and Panama, and other vessels. With this object in view, Harpending had gone across the country to Richmond, Virginia, and procured from Jefferson Davis, the president of the Confederate States, a letter of marque, authorizing him to prey upon the commerce of the United States, and to burn, bond, or take any vessels of its citizens; and also a letter of instructions directing him how to act, and containing the form of the bond, in case any prize taken should be bonded. Upon his return to San Francisco, he and Rubery made arrangements for the purchase of such a vessel as would suit their purpose; but these arrangements afterward failed, on account of the dishonor of the drafts drawn for the purchase-money by Rubery, and the consequent want of funds. They, also, made a voyage to Cerros Island for the purpose of examining into its fitness as a depot and as a rendezvous, whence to attack the Panama steamers. In January or February, 1863, Harpending made the acquaintance, at San Francisco, of William C. Law, a ship captain; broached to him the project of fitting out a privateer; stated what had been done; exhibited his letter of marque and instructions; solicited him to enter into the enterprise, and assist in procuring a vessel; and said, among other things, that, if he had succeeded in carrying out his previous arrangements, he could easily have taken three of the mail steamers. Law agreed to take part in the scheme; and soon afterward pointed out the schooner J. M. Chapman, a vessel of about ninety tons burden, and a fast sailer, as well adapted for the intended cruise. Several meetings in reference to the subject took place between Harpending, Rubery, Law and the defendant Greathouse, who had been introduced by Harpending to Law as a capitalist; and the result was that Greathouse purchased the schooner, and furnished money to procure arms, ammunitions and stores, and to engage a mate and a crew. The next morning Law took charge of the schooner; moved it to a wharf at the city front; informed Libby of the project, and induced him to go as mate, and engaged four seamen and a cook. All this time Greathouse gave out that he was acting in the interest of the "Liberal Party" in Mexico, and under this pretext, arms and ammunition were purchased, consisting of two brass rified twelve-pounders, shells, fuse, powder, muskets, pistols, lead, caps and knives. These were packed in cases marked "oil-mill" and "machinery," and shipped as quietly as possible; and there was also shipped a number of uniforms, such as are usually worn by men on vessels of war. A large amount of lumber was also purchased and shipped, with which to construct berths, a prison room, and a lower deck. While these preparations were going on, and every thing was being made ready to get off, the relations in which the participants were to stand in respect to one another were arranged. It was settled that Greathouse, in consideration of the material aid he had furnished, should be first, and that Law should be sailing-master, and second in charge. There was some discussion as to the share each was to have in the fruits of the expedition; and though nothing definite was settled, it was understood that Greathouse was to have the largest share, Harpending the next, Law next, Rubery fourth, and Libby fifth. The plan of the cruise was to sail from San Francisco on Sunday, March 15th, 1863, to the island of Guadalupe, which lies some three hundred miles off the coast of California; there land Harpending and the fighting men, who were to be shipped on the night of Saturday, March 14; thence proceed

to Manzanillo, and discharge such freight as might be taken; then return to Guadalupe, and fit the schooner for privateering purposes; then proceed again to Manzanillo, where the men were to be enrolled and their names inserted in the letter of marque, a copy of which was thereupon to be forwarded to the government of the Confederate States. It was their plan first, to capture a steamer bound from San Francisco to Panama, on its arrival at Manzanillo, land its passengers, and with the steamer thus taken, capture a second steamer; next to seize a vessel from San Francisco, then engaged in recovering treasure from the wreck of the steamer Golden Gate; thence they were to go to the Chincha Islands, and burn United States vessels there; thence to the China Sea, and finally into the Indian Ocean. In pursuance of this plan, and to prevent suspicion, the schooner was "put up" for Manzanillo. A partial cargo was shipped on board, and Law cleared at the custom-house for that port, signing and swearing to a false manifest. On the night of March 14, in accordance with the plan arranged, all the participants went on board. Fifteen persons, who had been employed by Harpending as privateersmen, were placed in the hold in an open space left for them among the cargo directly under the main hatch. The only person absent was Law, who remained on shore with the understanding that he should be on hand before morning. It afterward appeared that he had become intoxicated, and did not get down to keep his appointment until after the schooner had been seized.

During the evening, Rubery had heard rumors that the vessel was to be overhauled, and as the morning approached and Law did not appear, he proposed sailing without him. At daylight, Law being still absent, Libby cast off the lines and began working the schooner out from the wharf into the stream. The mainsail was partially hoisted; but no sooner had the wharf been left, than two boats were observed putting off from the United States sloop-of-war Cyane, then lying at anchor in the bay. As they headed for the schooner, Libby, pointing at them, said to Greathouse that they were after them. Rubery then insisted on running up the sails; but Libby replied that there was no wind, and it would be useless. In a few minutes afterward, the schooner was boarded and seized by the officers of the United States, and the enterprise nipped in the bud. Scarcely had the seizure been effected, when Law made his appearance on board and was arrested with the others. The revenue officers of the United States had been aware of the intended enterprise from an early period, and maintained a constant watch night and day on the vessel. They knew the character of the cargo, which had been carefully noted by the watchmen; were aware of the shipment of arms, and saw the cases with their false marks. On the Saturday afternoon when the schooner was cleared for Manza-

nillo, they increased the watch, chartered a steam-tug, and put policemen on board. They also made arrangements for the reception and confinement of prisoners at the United States fortifications on Alcatraz Island, and procured the two boats with their crews from the war-ship Cyane, to act in conjunction with them on a given signal. In the evening, the revenue officers themselves went on board the tug, proceeded to a wharf next that at which the J. M. Chapman lay, and watched the men going on board. When the schooner cast off its lines at daylight and headed out into the stream, the boats from the Cyane put off and boarded it according to previous arrangement; and at the same time the tug steamed up. Greathouse and Libby were on deck; the others were below. Fifteen men were found in the hold under the hatch, besides two sailors, who had been placed there over night to prevent them from leaving the vessel. A search being instituted for papers, a number of scraps, some torn, some chewed, and some partially burned, were found strewn about the hold. The two sailors confined testified that some of the party had employed the time intervening between the boarding of the vessel and the opening of the hatchway in destroying papers. Loaded pistols and bowie-knives were found stowed away in the interstices between the packages of the cargo. In the baggage of Harpending and Rubery were found, among other papers, a proclamation to the people of California to throw off the authority of the United States; a plan for the capture of the United States forts at San Francisco, and particularly Alcatraz; also, the form of an oath of fidelity to their cause, with an imprecation of vengeance on all who should prove false. It was shown that some of these papers were in the handwriting of Harpending; and Rubery admitted that he and one of the defendants had spent some time in preparing the oaths. After the seizure and arrest, the prisoners were taken to Alcatraz and confined. The schooner was unloaded, and the arms and munitions examined. An army officer testified that, in his opinion, the schooner might have destroyed a Panama steamer; but naval officers expressed a doubt whether this could have been done. The defense offered no testimony; but claimed, among other things, that a state of war existed between the United States and the Confederate States; that the latter were entitled to, and had in fact received from the former, belligerent rights; that privateering on the part of either side was a legitimate mode of warfare, and made those engaged amenable only to the laws of war; that at least, the defendants could not then be held to have committed any offense of which the court could take jurisdiction. They also claimed that the schooner had not started on her voyage, but had left the wharf with the intention of anchoring in the stream and waiting there for the captain and papers; that whatever the ultimate intention might

have been, there had, in fact, been no commencement of the cruise, and that, at any rate, no offense could have been committed until the schooner had reached Manzanillo, and been ready to commence hostilities. They finally insisted that there could be no treason and no conviction under the indictment, for the reason that "aid and comfort" had not been actually given.

William H. Sharp, U. S. Atty., and Thompson Campbell, for the United States.

Delos Lake and Alexander Campbell, for defendants.

Before FIELD, Circuit Justice, and HOFFMAN, District Judge.

FIELD, Circuit Justice (charging jury). Before proceeding to give any instructions in this case, it may be proper to briefly call attention to your appropriate and only province in the determination of the issues presented. There prevails a very general, but, an erroneous opinion, that in all criminal cases the jury are the judges as well of the law as of the fact—that is, that they have a right to disregard the law as laid down by the court, and to follow their own notions on the subject. Such is not the right of the jury. They have the power, it is true, to disregard the instructions of the court, and in case of acquittal their decision will be final—for new trials are not granted in criminal cases where a verdict has passed in favor of the defendant; but they have no moral right to adopt their own views of the law. It is their duty to take the law from the court and apply it to the facts of the case. It is the province of the court, and of the court alone, to determine all questions of law arising in the progress of a trial; and it is the province of the jury to pass upon the evidence and determine all contested questions of fact. The responsibility of deciding correctly as to the law rests solely with the court, and the responsibility of finding correctly the facts, rests solely with the jury. The separation of the functions of the court from those of the jury, in this respect, is essential to the efficacy and safety of jury trials. Any other doctrine would lead only to confusion and uncertainty in the administration of justice. "I hold it," says Mr. Justice Story, "the most sacred constitutional right of every party accused of crime, that the jury should respond as to the facts, and the court as to the law. * * * This is the right of every citizen, and it is his only protection." You will therefore, in this case, gentlemen, take the law from the court, and follow it. If the court err, the responsibility will not be shared by you.

The defendants are indicted for engaging in, and giving aid and comfort to, the existing rebellion against the government of the United States. The indictment is framed under the second section of the act of congress of July 17, 1862, entitled "An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes;" and it charges the commission of acts, which, in the judgment of the court, amount to treason within the meaning of the constitution. Treason is the only crime defined by the constitution. That instrument declares that "treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort." The clause was borrowed from an ancient English statute, enacted in the year 1352, in the reign of Edward III., commonly known as the "Statute of Treasons." Previous to the passage of that statute there was great uncertainty as to what constituted treason. Numerous offenses were raised to its grade by arbitrary constructions of the law. The statute was passed to remove this uncertainty, and to restrain the power of the crown to oppress the subject by constructions of this character. It comprehends all treason under seven distinct branches. The framers of our constitution selected one of these branches, and declared that treason against the United States should be restricted to the acts which it designates. "Treason against the United States," is the language adopted, "shall consist only in levying war against them, or adhering to their enemies, giving them aid and comfort." No other acts can be declared to constitute the offense. Congress can neither extend, nor restrict, nor define the crime. Its power over the subject is limited to prescribing the punishment.

At the time the constitution was framed, the language incorporated into it, from the English statute, had received judicial construction, and acquired a definite meaning; and that meaning has been generally adopted by the courts of the United States. Thus Chief Justice Marshall, in commenting upon the term "levying war," says: "It is a technical term. It is used in a very old statute of that country whose language is our language, and whose laws form the substratum of our laws. It is scarcely conceivable that the term was not employed by the framers of our constitution in the sense which had been affixed to it by those from whom we borrowed it. So far as the meaning of any terms, particularly terms of art, is completely ascertained, those by whom they are employed must be considered as employing them in that ascertained meaning, unless the contrary be proved by the context. It is, therefore, reasonable to suppose, unless it be incompatible with other expressions of the constitution, that the term 'levying war' is used in that instrument in the same sense in which it was understood, in England and in this country, to have been used in statute 25 of Edward III., from which it is borrowed."

The constitutional provision, as you per-

ceive, is divided into two clauses, "levying war against the United States," and "adhering to their enemies, giving them aid and comfort." The term "enemies," as used in the second clause, according to its settled meaning, at the time the constitution was adopted, applies only to the subjects of a foreign power in a state of open hostility with us. It does not embrace rebels in insurrection against their own government. An enemy is always the subject of a foreign power who owes no allegiance to our government or country. We may, therefore, omit all consideration of this second clause in the constitutional definition of treason. To convict the defendants they must be brought within the first clause of the definition. They must be shown to have committed acts which amount to a levying of war against the United States. To constitute a levying of war there must be an assemblage of persons in force, to overthrow the government, or to coerce its conduct. The words embrace not only those acts by which war is brought into existence, but also those acts by which war is prosecuted. They levy war who create or carry on war. The offense is complete, whether the force be directed to the entire overthrow of the government throughout the country, or only in certain portions of the country, or to defeat the execution and compel the repeal of one of its public laws.

It is not, however, necessary that I should go into any close definition of the words "levying war," for it is not sought to apply them to any doubtful case. War has been levied against the United States. War of gigantic proportions is now waged against them, and the government is struggling with it for its life. War being levied, all who aid in its prosecution, whether by open hostilities in the field, or by performing any part in the furtherance of the common object, "however minute or however remote from the scene of action," are equally guilty of treason within the constitutional provision. In treason there are no accessories; all who engage in the rebellion at any stage of its existence, or who designedly give to it any species of aid and comfort, in whatever part of the country they may be, stand on the same platform; they are all principals in the commission of the crime; they are all levying war against the United States.

In Ex parte Bollman and Ex parte Swartwout, 4 Cranch [8 U. S.] 127. Mr. Chief Justice Marshall, in delivering the opinion of the supreme court of the United States, said: "It is not the intention of the court to say that no individual can be guilty of this crime who has not appeared in arms against his country. On the contrary, if war be actually levied—that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose—all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors." And in commenting upon this language, on the trial of Burr, the same distinguished judge said: "According to the opinion, it is not enough to be leagued in the conspiracy, and that war be levied, but it is also necessary to perform a part; that part is the act of levying war. That part, it is true, may be minute; it may not be the actual appearance in arms, and it may be remote from the scene of action, that is, from the place where the army is assembled; but it must be a part, and that part must be performed by a person who is leagued in the conspiracy. This part, however minute or remote, constitutes the overt act, of which alone the person who performs it can be convicted." 2 Burr's Trial, 438, 439. The indictment in the present case, as I have already stated, is based upon the second section of the act of July 17, 1862. The constitution, although defining treason, leaves to congress the authority to prescribe its punishment. In 1790, congress passed an act fixing to the offense the penalty of death. By the first section of the act of July, 1862, congress gave a discretionary power to the courts to inflict the penalty of death, or fine and imprisonment, providing that in either case the slaves of the party convicted, if any he have, shall be liberated. The second section of the act declares "that if any person shall hereafter incite, set on foot, assist, or engage in any rebellion or insurrection against the authority of the United States, or the laws thereof, or shall give aid or comfort thereto, or shall engage in or give aid and comfort to any such existing rebellion or insurrection, and be convicted thereof, such person shall be punished by imprisonment for a period not exceeding ten years, or by a fine not exceeding $10,000, and by the liberation of all his slaves, if any he have, or by both said punishments, at the direction of the court." The fourth section provides that the act shall not be construed in any way to affect or alter the prosecution, conviction or punishment of any person guilty of treason before its passage, unless convicted under the act.

There would seem, upon a first examination, to be an inconsistency between the first and second sections of this act—the first section declaring a particular punishment for treason, and the second declaring, for acts which may constitute treason, a different punishment. It appears from the debate in the senate of the United States, when the second section was under consideration, that it was the opinion of several senators that the commission of the acts which it designates might, under some circumstances, constitute an offense less than treason. The constitution, as you have seen, declares that "treason against the United States shall consist only in levying war or in adhering to their enemies, giving them aid and comfort." Rebels not being ene-

mies within its meaning, an indictment alleging the giving of aid and comfort to them had been, as was stated, held defective. But if such ruling had been made, it was made, we may presume, not because the giving of aid and comfort to rebels was not treason, but because the parties giving such aid and comfort were equally involved in guilt with those in open hostilities and should have been indicted for levying war; for every species of aid and comfort which, if given to a foreign enemy, would constitute treason within the second clause of the constitutional provision—adhering to the enemies of the United States—would, if given to the rebels in insurrection against the government, constitute a levying of war under the first clause. The second section of the act, however, relieves the subject from any difficulty so far as the form of the indictment is concerned. It is not necessary now to use specifically the term "levying war;" it will be sufficient if the indictment follows the language of the act, as the indictment does in the present case. But we are unable to conceive of any act designated in the second section which would not constitute treason, except perhaps as suggested by my associate, that of inciting to a rebellion. If we lay aside the discussion in the senate, and read the several sections of the act together, the apparent inconsistency disappears. Looking at the act alone, we conclude that congress intended: 1. To preserve the act of 1790, which prescribes the penalty of death, in force for the prosecution and punishment of offenses committed previous to July 17, 1862, unless the parties accused are convicted under the act of the latter date for subsequent offenses; 2. To punish treason thereafter committed with death, or fine and imprisonment, in the discretion of the court, unless the treason consist in engaging in or assisting a rebellion or insurrection against the authority of the United States, or the laws thereof, in which event the death penalty is to be abandoned, and a less penalty inflicted. By this construction, the apparent inconsistency in the provisions of the different sections is avoided, and effect given to each clause of the act. The defendants are therefore in fact on trial for treason, and they have had all the protection and privileges allowed to parties accused of treason, without being liable, in case of conviction, to the penalty which all other civilized nations have awarded to this, the highest of crimes known to the law.

The indictment charges that on the sixteenth of March, 1863, and long before and since, an open and public rebellion by certain citizens of the United States, under a pretended government called the Confederate States of America, has existed against the United States and their authority and laws; that the defendants, in disregard of their allegiance to the United States, did on that day, and divers other times before and since, at the city of San Francisco, "maliciously and traitorously" engage in, and give aid and comfort to the said rebellion; that in the prosecution and execution of their "treasonable and traitorous" purposes, they procured, prepared, fitted out and armed a schooner called the J. M. Chapman, then lying within the port of San Francisco, with the intent that the same should be employed in the service of the rebellion, to cruise on the high seas, and commit hostilities upon the citizens, property and vessels of the United States; and that they entered upon the said schooner and sailed from the port of San Francisco upon such cruise in the service of said rebellion. In other words, the indictment alleges: 1. The existence of a rebellion against the United States, their authority and laws; 2. That the defendants traitorously engaged in and gave aid and comfort to the same; 3. That in the execution of their treasonable and traitorous purposes, they procured, fitted out, and armed a vessel to cruise in the service of the rebellion upon the high seas, and commit hostilities against the citizens, property and vessels of the United States; 4. That they sailed in their vessel from the port of San Francisco upon such cruise in the service of the rebellion.

The existence of the rebellion is a matter of public notoriety, and like matters of general and public concern to the whole country, may be taken notice of by judges and juries without that particular proof which is required of the other matters charged. The public notoriety, the proclamations of the president, and the acts of congress are sufficient proof of the allegation of the indictment in this respect. The same notoriety and public documents are also sufficient proof that the rebellion is organized and carried on under a pretended government, called the Confederate States of America.

As to the treasonable purposes of the defendants there is no conflict in the evidence. It is true the principal witnesses of the government are, according to their own statements, co-conspirators with the defendants and equally involved in guilt with them, if guilt there be in any of them. But their testimony, as you have seen, has been corroborated in many of its essential details. You are, however, the exclusive judges of its credibility. The court will only say to you that there is no rule of law which excludes the testimony of an accomplice, or prevents you from giving credence to it, when it has been corroborated in material particulars. Indeed, gentlemen, I have not been able to perceive from the argument of counsel that the truth of the material portions of their testimony has been seriously controverted.

It is not necessary that I should state in detail the evidence produced. I do not pro-

pose to do so. It is sufficient to refer to its general purport. It is not denied, and will not be denied, that the evidence tends to establish that Harpending obtained from the president of the so-called Confederate States a letter of marque—a commission to cruise in their service on the high seas, in a private armed vessel, and commit hostilities against the citizens, vessels and property of the United States; that his co-defendants and others entered into a conspiracy with him to purchase, and fit out, and arm a vessel, and cruise under the said letter of marque, in the service of the rebellion; that in pursuance of the conspiracy they purchased the schooner J. M. Chapman; that they purchased cannon, shells and ammunition, and the means usually required in enterprises of that kind, and placed them on board the vessel; that they employed men for the management of the vessel; and that, when everything was in readiness, they started with the vessel from the wharf, with the intention to sail from the port of San Francisco on the arrival on board of the captain, who was momentarily expected. Gentlemen, I do not propose to say anything to you upon the much disputed questions whether or not the vessel ever did, in fact, sail from the port of San Francisco, or whether, if she did sail, she started on the hostile expedition. In the judgment of the court they are immaterial, if you find the facts to be what I have said the evidence tends to establish.

When Harpending received the letter of marque, with the intention of using it, if such be the case (and it is stated by one of the witnesses that he represented that he went on horseback over the plains expressly to obtain it), he became leagued with the insurgents—the conspiracy between him and the chiefs of the rebellion was complete; it was a conspiracy to commit hostilities on the high seas against the United States, their authority and laws. If the other defendants united with him to carry out the hostile expedition, they, too, became leagued with him and the insurgent chiefs in Virginia in the general conspiracy. The subsequent purchasing of the vessel, and the guns, and the ammunition, and the employment of the men to manage the vessel, if these acts were done in furtherance of the common design, were overt acts of treason. Together, these acts complete the essential charge of the indictment. In doing them, the defendants were performing a part in aid of the great rebellion. They were giving it aid and comfort.

It is not essential to constitute the giving of aid and comfort that the enterprise commenced should be successful and actually render assistance. If, for example, a vessel fully equipped and armed in the service of the rebellion should fail in its attack upon one of our vessels and be itself captured, no assistance would in truth be rendered to the rebellion; but yet, in judgment of law, in legal intent, the aid and comfort would be given. So if a letter containing important intelligence for the insurgents be forwarded, the aid and comfort are given, though the letter be intercepted on its way. Thus Foster, in his treatise on Crown Law, says: "And the bare sending money or provisions, or sending intelligence to rebels or enemies, which in most cases is the most effectual aid that can be given them, will make a man a traitor, though the money or intelligence should happen to be intercepted; for the party in sending it did all he could; the treason was complete on his part, though it had not the effect he intended."

Wherever overt acts have been committed which, in their natural consequence, if successful, would encourage and advance the interests of the rebellion, in judgment of law aid and comfort are given. Whether aid and comfort are given—the overt acts of treason being established—is not left to the balancing of probabilities—it is a conclusion of law.

If the defendants obtained a letter of marque from the president of the so-called Confederate States, the fact does not exempt them from prosecution in the tribunals of the country for the acts charged in the indictment. The existence of civil war, and the application of the rules of war to particular cases, under special circumstances, do not imply the renunciation or waiver by the federal government of any of its municipal rights as sovereign toward the citizens of the seceded states.

As matter of policy and humanity, the government of the United States has treated the citizens of the so-called Confederate States, taken in open hostilities, as prisoners of war, and has thus exempted them from trial for violation of its municipal laws. But the courts have no such dispensing power; they can only enforce the laws as they find them upon the statute-book. They cannot treat any new government as having authority to issue commissions or letters of marque which will afford protection to its citizens until the legislative and executive departments have recognized its existence. The judiciary follows the political department of the government in these particulars. By that department the rules of war have been applied only in special cases; and notwithstanding the application, congress has legislated in numerous instances for the punishment of all parties engaged in or rendering assistance in any way to the existing rebellion. The law under which the defendants are indicted was passed after captives in war had been treated and exchanged as prisoners of war, in numerous instances.

But even if full belligerent rights had been conceded to the Confederate States, such rights could not be invoked for the protection of persons entering within the limits of states which have never seceded, and secretly getting up hostile expeditions against

our government and its authority and laws. The local and temporary allegiance, which every one—citizen or alien—owes to the government under which he at the time lives, is sufficient to subject him to the penalties of treason.

These, gentlemen, constitute all the instructions I have to give. My associate, Judge HOFFMAN, will submit some further observations to you. The case is one of much interest—not because it is the only case for treason tried in the state, but because of the great importance of the principles involved. As you will weigh carefully the evidence, and be guided by the instructions of the court, you will have no difficulty in reaching an intelligent and just verdict.

HOFFMAN, District Judge (charging jury). At the request of the presiding judge, I have prepared some observations which, in my judgment, it is not important that I should read. The ruling of the court on the principal point involved, a ruling in which I entirely concur, renders immaterial much of what I am about to say to you. As, however, the presiding judge deems it proper that our views should be made known on all the points debated at the bar, I will read what I have prepared, premising that if in anything I shall go beyond the charge just delivered, what I say is to be taken as the expression of my individual opinion. The charge of the presiding judge is to be exclusively received as the opinion and instructions of the court.

The defendants in this case are indicted under the second section of the act of July, 1862. The indictment in substance charges them with having engaged in, and given aid and comfort to the existing rebellion, by fitting out, arming and equipping a vessel, with intent that she should cruise in the service of the so-called Confederate States, under a letter of marque issued by the pretended authorities of those states, against the vessels and commerce of the United States. And that she did in fact sail from this port in such service, and under a letter of marque, on the alleged cruise.

In the constitution of the United States it is declared that the crime of treason shall consist only in levying war against the United States, and in adhering to their enemies, giving them aid and comfort. The last branch of this definition has always been admitted to apply only to cases of adhering, and giving aid and comfort to, foreign public enemies. It was therefore held that an indictment charging the defendant with having given aid and comfort to domestic rebels was bad, and that the acts should be charged as "a levying of war against the United States." It appears, however, to have been considered by congress that some acts might be committed which would constitute an "engaging in the present rebellion, and giving it aid and comfort," which would not amount to a levying of war, or to the crime of treason, within the meaning of the constitution. Under this idea, the act of 1862, in its first section, re-enacts the former statute against treason eo nomine, but modifies, in some respects, the penalty, while the second section denounces, as if it were a different offense, the "engaging in, and giving aid and comfort to, the existing rebellion." We have not been able to concur in the view which congress seems to have taken of the offenses created by these sections.

Every act which, if performed with regard to a public and foreign enemy, would amount to "an adhering to him, giving him aid and comfort," will, with regard to a domestic rebellion, constitute a levying of war. And, conversely, every act which, with regard to a domestic rebellion, will constitute "a levying of war," will, with regard to a foreign enemy, constitute "an adhering to him, giving him aid and comfort." "Every species of aid or comfort," says East, "which, when given to a rebel within the realm, would make the subject guilty of levying war, will, if given to an enemy, whether within or without the realm, make the party guilty of adhering to the king's enemies;" and for this he cites numerous authorities. 1 East, Crown Law, 78. That this must be so is evident on grounds of reason alone. As the framers of the constitution restricted the crime of treason to two classes of cases only, the one "adhering to the public enemy, giving him aid and comfort;" the other "levying war against the United States," what motive can be suggested for attaching any less guilt to him who aids and comforts a rebellion, than to him who aids and comforts a public enemy? A moment's consideration of the magnitude and power of the present rebellion, its aim not merely to change the form of government, or to resist the laws, but to dismember the country, and to destroy forever our integrity as a nation, and to inflict a fatal blow on the cause of human progress and civilization, will convince us that the dangers to be apprehended are as great, and the guilt of the actors as deep, when aid and comfort are given to a domestic rebellion, as when given to a public enemy. If, then, every species of aid and comfort given to the present rebellion constitutes a levying of war, it follows that in the two sections of the act referred to, congress has denounced the same crime; and that a party amenable to the second section for having "engaged in the rebellion and given it aid and comfort," must also be guilty of treason by levying war against the United States.

As, then, the offenses described are substantially the same, though a different penalty is attached to their commission by the sections referred to, it was held by the court, under the first indictment, which was in terms for treason, that the smaller penalty could alone be inflicted, that the prisoners could not be capitally punished, and could

therefore be admitted to bail. On the same grounds, it was considered that under the present indictment, which pursues the language of the second section, the offense charged was treason; that both the offense as described and the overt acts charged amounted to that crime, and that the accused were entitled to all the privileges secured by the constitution or allowed by law to parties on trial for treason; and this, notwithstanding that in consequence of the legislation referred to, the penalty of treason could not be inflicted. In determining, therefore, whether the defendants can be convicted under this indictment, it will be proper to consider whether their acts constitute in law "a levying of war;" for "an engaging in a rebellion and giving it aid and comfort," amounts to a levying of war; while at the same time we may also inquire whether their acts are such as would, if done with regard to a public enemy, constitute an adherence to him, "giving him aid and comfort."

With regard to levying of war, it is said by Mr. Chief Justice Marshall, that "when war is actually levied, that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose, all those who perform a part, however minute or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors." That war has actually been levied, and is now desolating a large portion of our country, is not disputed. The question then is, have the defendants leagued themselves with the rebellion, and in furtherance of the common design, performed a part, however minute, toward its accomplishment?

You have heard the testimony adduced to establish the treasonable designs long since entertained and attempted to be put in execution by the accused; that in furtherance of this design a letter of marque was procured from the authorities of the so-called Confederate States; that a vessel was purchased, arms and ammunition placed on board, and a crew engaged for the enterprise, who, if not actually apprised of all the designs of the leaders, were selected by them for the purpose of using them as the crew, and with the full assurance that they would be willing or could be compelled to embark in the enterprise; that a false manifest and bills of lading were prepared, the vessel cleared, and the men mustered in her hold, armed and ready to set sail; that she started from the wharf, was pursued, and after an abortive attempt to escape and continue on her voyage, and some preparations for resistance, she was captured. The intention with which all these things were done is not doubtful. They were done with the view of arming and fitting out the vessel to sail as a privateer against the commerce of the United States, and thus to take part in, and on the ocean to carry on the war, which, in other portions of the country, is now being

levied against the United States. They were done in furtherance of the common purpose of the rebels elsewhere engaged, and in league with them to accomplish the objects of the rebellion.

If you believe, from the evidence, that these acts were done with the purpose and intention I have stated, they are sufficient, in the opinion of the court, to constitute a "levying of war" against the United States within the meaning of the constitution. Much stress was laid by the defendant's counsel on the fact that it was stated by Libby to have been the design of the parties to proceed to Manzanillo, and there to fill up the letter of marque, enroll the names of the crew, and dispatch a copy of the letter of marque, with the names of the crew attached, to the authorities of the Confederate States. But it has appeared to us that that circumstance is immaterial. The letter of marque seems to have been issued in blank, that is, the name of the vessel, her tonnage, and other particulars usually inserted, were left to be filled up when the vessel was procured. Obtained, as this letter must have been, in advance of the procurement of any vessel or enlisting of a crew, it could have been issued in no other form so as to serve its purpose. But it was in the hands of the defendants, ready to be filled up at any moment. There is no proof that after Law saw it, it may not have been filled up whenever those who held it saw fit to do so. Its importance in this case does not consist in any authority it gave to levy war on the United States, to confer which, had it been issued by a belligerent power, the observance of every formality might be necessary; but as showing that the defendants were in league with the rebellion, and that they were co-operating with those actually levying war in other parts of the country, for the attainment of a common object.

But the indictment charges, not "a levying of war," but "an engaging in the rebellion, and giving to it aid and comfort." Although, as before observed, these charges amount to a levying of war, yet it will be convenient to consider for a moment whether the overt acts proved against these defendants are such as would, if done in aid of a public enemy, constitute "an adherence to him, giving him aid and comfort." For you will perceive that the terms employed are those heretofore used with respect to treason, by aiding a public enemy; and they are now, for the first time, applied to acts done in aid of a domestic rebellion. The nature of the acts constituting the offense, with reference to a public enemy, may therefore properly be considered in this inquiry; for it is evident that congress referred, by this section, to such acts as would, if done in aid of a public enemy, have constituted "an adherence to him, giving him aid and comfort."

It is perhaps not easy, by a general definition, to describe all the acts which would

amount, in judgment of law, to a giving of aid and comfort to an enemy. The text writers, as we have seen, describe it on general terms as including all such acts as would, if given to a rebel within the realm, amount to "a levying of war." What constitutes a levying of war has already been considered; but in the point of view in which I am now treating the question, it is necessary, to examine what acts have been held to be "a giving of aid and comfort" to a public enemy, and to see whether the acts committed by the defendants in respect of this rebellion are of the same nature.

Among the cases mentioned by the writers of "an adhering to the enemy, giving him aid and comfort," are the following: Raising men in England with intent to dethrone the king, and sending them abroad to the enemy (the French). Taking treasonable papers in a boat to go on board a vessel bound to France, where they were to be used for treasonable purposes; and, indeed. every species of treasonable correspondence with the enemy, although the intelligence may not have reached him. And, in general, the mere sending of money, provisions or intelligence to the enemy, is giving him aid and comfort, though on the way they should happen to be intercepted, and never reach him. So, too, it has been held that cruising on the king's subjects under a French commission, France being then at war with England, is an adhering to the king's enemies, though no other act of hostility was laid or proved. It was not denied at the bar that a similar act, under a letter of marque issued by the authorities of the so-called Confederate States, would constitute both a levying of war and an "engaging in the rebellion, giving it aid and comfort."

But it was contended that in this case the voyage was not commenced by the sailing of the vessel; and, second, that if it were, it was not a cruise against the commerce of the United States and in aid of the rebellion, inasmuch as the intention was not to commit hostilities immediately, but to proceed to a neutral port, and from thence enter upon the execution of the treasonable design.

First. As to whether the vessel can be deemed to have sailed upon her voyage? The sailing of a vessel, or the commencement of voyage. depends upon what acts are done and the intention of the parties who do them. In general, a voyage is deemed to have been commenced when the vessel in readiness for sea quits her wharf or other place of mooring without the intention of returning to it. But the inference to be drawn from this fact may undoubtedly be rebutted by proof of an intention not to commence the voyage at that time. If, for example, a vessel which has been fully laden and cleared at the custom-house. and is about to sail. should, by orders from her owners. be detained, the fact that. to save wharfage or from other considerations of convenience, her master has taken her into the stream, and there brought her to an anchor, would not justify us in considering her as having sailed, or the voyage as having commenced, notwithstanding that she has no intention of returning to the wharf or to her former moorings. On the other hand, if a vessel quits the wharf with the intention of proceeding on her voyage, the latter will be deemed to have commenced, notwithstanding that she expects and intends to wait until a pilot can be procured or discharged, or until the tide turns, or other cause of temporary delay be removed.

In the case at bar, the only testimony on the point, and that on which the defendants rely, is the statement made by Libby. It appears, from his account, that the guns, ammunition and other cargo being on board, and the vessel cleared. it was determined to set sail as soon as the tide served on Sunday morning. The men who were to form the crew were thereupon taken on board during the middle of Saturday night, and secreted in the hold. Law. who was to act as captain, or rather sailing-master, left the ship in the evening, promising to return during the night, and assist in getting the men on board. As the night wore on, and he failed to make his appearance, some doubts of his fidelity appear to have been entertained. Rubery suggested the expediency of going without him, but this was overruled by Greathouse and Libby, the latter observing that the vessel was fast aground, and could not immediately depart.

About daylight, the tide having sufficiently risen, the lines were cast off, and the vessel hauled alongside of a schooner which lay near. Her jib was then hoisted and she ran out into the stream; but the tide being strong, the mainsail was loosed and hoisted one-half or two-thirds of the way up. when boats were observed leaving the United States ship Cyane, apparently in pursuit. Becoming satisfied that such was the case, Libby and Greathouse took hold of the main halliards to pull the sail further up, but desisted from the attempt on finding it impracticable to escape, there being no breeze. The vessel was almost immediately afterward boarded by the United States officers.

It is contended that. under these circumstances, the vessel cannot be deemed to have sailed or commenced her voyage, as there was no intention immediately to depart. To arrive at the intention of the parties, we must consider all the circumstances.

That the vessel was ready for sea—that every preparation for the enterprise was completed—is admitted. except that Law had not come on board with the translation of certain documents relating to the cargo, which it was thought desirable to have. The presence of so large a number of men in the hold rendered any delay dangerous, if not impracticable. How long they would have waited for Law does not appear. His failure to join the vessel during the night. according to agreement, had already awakened suspicion, and

though the suggestion to sail without him was not acceded to, yet it may have been overruled as much in consequence of Libby's remark, that the vessel was hard aground and must wait until the tide rose, as from any fixed resolution not to sail without him. This conversation occurred during the night, but when daylight came, and the tide served, the vessel, in accordance with the previous design of the parties, cast off her lines, set her sails and hauled into the stream. It is impossible to know how long she would have waited for Law. Every hour that elapsed must have tended to strengthen their suspicions of his treachery and furnished additional motives for instant departure. Bue even assuming that they would have for a short time delayed proceeding on the voyage, in the hope that he would join them at the last moment. we do not consider that such a contingent and indefinite intention which, from its nature, was liable to be abandoned at any moment. is sufficient to justify you in saying that the voyage was not commenced. The case seems in no respect to differ from that of a vessel which leaves her moorings for the purpose of going to sea, but with the intention of suspending her voyage for a short time while she awaits the arrival of a pilot, who is momentarily expected. There may have been an intention to suspend, for a brief period, the prosecution of a voyage already commenced, but it was not the postponement of the commencing of the voyage. If, therefore, from the evidence, you believe the facts to be as I have detailed, our opinion is that they are sufficient in law to constitute a sailing of the vessel and a commencement of the voyage.

But it is contended that, assuming the vessel to have sailed, she did not sail on a voyage which can be considered "a cruise to commit hostilities upon the commerce of the United States." The determination of this point also depends upon the acts and intentions of the parties. It is stated by both Law and Libby, that the scheme or design of the expedition was to proceed from this port to the island of Guadalupe, where the men, the arms and ammunition were to be landed. The vessel was then to proceed to Manzanillo, and deliver her other cargo. Here her letter of marque was to be filled up. her crew formally enrolled, and a copy of the letter and crew list sent to the authorities of the Confederate States. From Manzanillo she was to return to Guadalupe, construct a deck and some houses for her crew. take on board her guns and ammunition. and proceed to depredate upon our commerce.

It is contended that, as hostilities were not immediately to commence, and as the voyages to Guadalupe, thence to Manzanillo. and thence back to Guadalupe, were to be peaceful, the vessel cannot be regarded as having been "engaged." when sailing from this port. "on a cruise to commit hostilities against the United States." nor until her letter of marque was filled up as being "in the service of the Con-

federate States." But it can hardly be contended that the mere postponement of actual hostilities can deprive the voyage of the character stamped upon it by its main purpose and design. If, for example, it had been determined not to attack any vessel before reaching a certain latitude, or until a treasure-laden steamer should be fallen in with. which it was known would not sail until the expiration of some weeks. such a determination could not alter the nature of the voyage as a cruise against the commerce of the United States. Nor could an intention to stop at one or more ports before commencing hostilities have any such effect, where it appears that such preliminary voyages are subordinate to the main design. and are undertaken in furtherance of and as conductive to the paramount object for which the vessel was bought, armed, equipped, and caused to sail.

Cases might occur where the guilty design is intended to be carried into execution at a remote time and place, and subsequent to other peaceful voyages first to be accomplished. If, for example, the design were to sail from this port to Hongkong, and deliver a cargo; thence to proceed, with a like object, to Calcutta; thence to Liverpool, and thence to Halifax, where the vessel is to be fitted up as a privateer, it might perhaps be difficult to affirm that at the time of leaving this port her cruise as a privateer had commenced. On the other hand, the mere intention to touch at a neighboring port, to take in water or other supplies, could not affect the character of the voyage as determined by its principal object and intention.

It is not easy to draw a precise line of discrimination between the cases. In general, it may be stated that when the preliminary acts are to be performed in furtherance of the principal intent. when they are done to carry out that intent, and as the best means of accomplishing it, the nature of the voyage will be fixed by the main design which is thus in process of execution. But when the execution of the guilty design is to be postponed to a distant time and place. when previous independent acts. in themselves innocent, are to be first performed, the mere existence of a remote ulterior intention to enter upon the execution of a criminal enterprise will not stamp a guilty character upon otherwise innocent proceedings. The test seems to be: Was there a single enterprise to be carried out by such means as would best promote its accomplishment, or was there a series of distinct and independent enterprises designed, the last one of which. in point of time, was to be of guilty nature?

On this point we are fortunately not without authority. By the second and third sections of the act of congress of May 10. 1800 [2 Stat. 70]. it is made a criminal offense for any American citizen voluntarily to serve on board a vessel of the United States "employed or made use of in the transportation or carrying of slaves from one foreign place to an-

other;" or on board any foreign vessel "employed in the slave trade."

In the case of U. S. v. Morris, 14 Pet. [39 U. S.] 464, it was proved that the defendant, an American citizen, was voluntarily serving on board the schooner Butterfly. There were found on board this vessel, when captured, the usual equipments of vessels engaged in the slave trade, leagers capable of containing two hundred or three hundred gallons of water, plank suitable for a slave deck, etc. But she had also on board a full cargo, adapted either to the traffic in negroes, or to lawful trade with the coast of Africa. No slaves were found on board, and it was proved that from the situation and condition of the vessel no slaves could have been transported in her at any time during the voyage in which she was then engaged; and that it would have been necessary to discharge her cargo before the slave deck could have been fitted up, or slaves taken on board, and that the vessel was short of water, and had no supplies for any negroes who might be taken on board. Under these circumstances, the question was raised, whether the vessel could be regarded "as employed and made use of in the carrying and transportation of slaves," under the second section of the act, and "as employed in the slave trade," under the third section. The supreme court of the United States held the affirmative of both propositions.

In the case of U. S. v. The Catharine [Case No. 14,755], it appeared that the outward voyage to the coast of Africa was undertaken under the American character and ownership, but that it was planned and undertaken under an arrangement that the ownership and national character should be changed, on her arrival on the coast, and before any slaves should be taken on board, and that she was then to be employed in the transportation of slaves. It was held that from the moment of her departure she was to be considered as "employed in the slave trade;" that the penalty was incurred, and the forfeiture attached, at the very inception of the voyage; that the vessel became tainted with the offence, wherever she might go, and into whatever hands she might fall, and the forfeiture attached upon all interests concerned.

It will be perceived that in these cases the question as to the real nature of the voyage arose in a manner closely resembling that in which the same question is presented for our consideration. In both it was held that it was to be determined by its objects and by the intentions of the parties. If a vessel which has no slaves on board, but has a cargo which must necessarily be discharged before slaves can be taken on board, or a deck for their reception fitted up, is nevertheless to be considered as "employed and made use of in the carrying and transportation of slaves," because that was the object and design of the voyage, it would seem to follow that a vessel equipped, manned and armed as a privateer, and sailing with that intention, is to be deem-

ed to be engaged or employed on a privateering cruise from the inception of the voyage, notwithstanding she has committed no hostilities and does not design to commit any until certain preliminary arrangements have been consummated.

It is unnecessary to repeat what has already been said in regard to the letter of marque. The question is not whether the commission, or letter of marque, was in all respects regular or formally executed. Emanating from the rebel government, it could, of course, confer no authority to levy war on the United States, or to destroy or rob the vessels of her citizens. The question is, was the vessel sailing under the letter and in the service of the rebel government? Whatever remained to be done, if indeed anything remained, could be done as well at sea as on land. Harpending or Greathouse could at any moment, and when about to capture some rich prize, or on the point of being themselves captured by an American cruiser, have filled up the blanks with all that was required; and the fact that a copy of the document had not been dispatched to the rebel authorities, would neither impair any protection to which the letter of marque, it was supposed, would have entitled them, or relieve them from the guilt of cruising under a letter of marque to commit hostilities against the United States.

If these views be correct, it follows that the defendants were engaged on a cruise under a letter of marque from the rebel government against the vessels and property of the United States, and have thus (supposing such a cruising to have been necessary to constitute the offense charged, which it is not,) given aid and comfort to the rebellion within the meaning of those terms as usually applied to the public enemy, but in this act applied to the existing rebellion.

If, therefore, you find that the facts, on the assumed truth of which these observations are based, are proved beyond a reasonable doubt by the evidence, our opinion is that they constitute a levying of war against the United States, and "an engaging in giving aid and comfort to the rebellion," within the meaning of the second section of the act of 1862, and as charged in the indictment.

I have endeavored, gentlemen, to consider the questions involved in this cause in the calm spirit of judicial inquiry, and unaffected by the excitements of the hour or the fierce passions necessarily aroused by the stupendous contest in which the country is engaged. For the accused, personally, I feel a deep regret, and especially for one of them, who appears to have been animated rather by a zeal for the cause which he has unhappily espoused than by the more unworthy motive of enriching himself by the plunder of his fellow-citizens. It is deeply to be regretted that the courage and willingness to sacrifice himself for the benefit of his associates, slight glimpses of which have been revealed by the evidence, have been wasted on an en-

terprise which is as indefensible in morals, or even under any political theory ever proclaimed by the advocates of secession, as it is criminal in law.

The jury found the defendants guilty. Sentence imposing both fine and imprisonment was pronounced upon them. Rubery was subsequently pardoned by President Lincoln, at the request of "our good friend," John Bright, of England. The other defendants were subsequently, during the attendance of Mr. Justice Field upon the supreme court, at Washington, brought before District Judge Hoffman, sitting in the circuit court, on habeas corpus, and released from imprisonment upon taking the oath prescribed in the proclamation of President Lincoln, issued after their sentence, and upon giving bond for their future good behavior. [Case No. 5,741.]