TAYLOR *v.* STATE.

(In Banc.   Jan. 25, 1943.)

[11 So. (2d) 663.   No. 35143.]

(1)

2

4

SMITH, C. J., and ALEXANDER and ANDERSON, JJ., dissenting.

**G. C. Clark,** of Waynesboro, **Grover C. Powell,** of Atlanta, Ga., and **Hayden C. Covington,** of Brooklyn, N. Y., for appellant.

8

Greek L. Rice, Attorney-General, by Geo. H. Ethridge, Assistant Attorney-General, for appellee.

Arthur Garfield Hays and Whitney North Seymour, both of New York, N. Y., Charles E. Evans and Quitman Ross, both of Laurel, as Amicus Curiae.

Argued orally by **Hayden C. Covington**, for appellant, and by **Geo. H. Ethridge**, for appellee.

**Roberds, J.**, delivered the opinion of the court.

The Legislature of Mississippi at its 1942 regular session enacted Chapter 178, General Laws of Mississippi 1942, which the Reporter will set out in full.

Appellant was indicted, tried, convicted and sentenced for violation of Section 1 of that Act. He appeals.

He first contends that the evidence is not sufficient to support his conviction.

Summarized the evidence is that appellant and his wife, the latter part of May and the first of June, 1942, appeared at the homes of a Mrs. Joyner and Mrs. Denson in Madison County, Mississippi, and then and there, according to the testimony of Mrs. Joyner, said to those present: "Well, he came in and said he wanted to talk with me; and they came in and sat down and he began to talk, and looked through the Bible; he didn't read any in the Bible, but just turned through it, and talked; and told me that the President was doing wrong to send our boys across to be killed for nothing, and that Hitler would rule, and he wouldn't have to come over here to do it, but he would do it; he would rule, but he wouldn't come here. And he said it was wrong for us to salute the Flag; that we just worshipped our Government and our Flag, and looked on it as something sacred; and that it was wrong for us to do that; and that no doubt my son thought he was doing the right thing by going where he was and doing what he did; but that it was wrong for him to fight the enemies, and to go there."

A Mrs. Bryant, who was present, testified: "Well, he said it was wrong for our President to send these boys across in uniform to fight our enemies; said it was wrong to fight our enemies; said they were being shot down for no purpose at all; said Hitler would rule, but he wouldn't

have to come here to rule; and he said the quicker the people here quit bowing down and worshipping and saluting our Flag and Government, the sooner we would have peace.''

Mrs. Denson gave the same version in substance of what was said at her home, except she added: ''He said there were just as many sheep—he divided the people as sheep and goats, the Jehovah's witnesses were the sheep and the believers; and he said there were just as many sheep in Germany as there were here. And just at that time, Mrs. Taylor spoke up and says, 'You know you would hate to see a German mother lose her son as much as you would anyone else.' But he told me to study the literature, and that I would get comfort from it.'' He had theretofore appeared at the home of Mrs. Bryant and sold her some literature.

Mrs. Joyner and Mrs. Denson had each lost a son in the attack upon Pearl Harbor. He also said their sons would come back and live with them forever. Appellant says it was his intention to comfort them. They were strangers to appellant and the record does not disclose how he knew their sons had been killed.

Appellant admitted making some of the statements and flatly denied making others. He alone testified in his own behalf as to whether the statements were or were not made. His wife, who was present when it is claimed the statements were made, was not present at the trial and did not testify. It was the province of the jury, not ours, to say who was testifying truthfully—these three ladies or appellant.

The proof furthermore is that each of these three ladies purchased from appellant certain written literature, consisting of twenty-two books and pamphlets, for thirty-five cents. A number of these books and pamphlets were introduced in evidence. Certain excerpts from this literature were selected and introduced by the state. Four of such excerpts were:

"All nations of the earth today are under the influence and control of the demons. . . . All the nations suffer the same fate or come to the same end, because all nations of earth are on the wrong side, that is, on the losing side. All of such nations are against the Theocratic Government, that is the government of kingdom of the Almighty God. . . . and all are under the control of the invisible host of demons, . . ."

"But to compel people to salute a flag or any other image is wrong, and particularly if that person believes on God and Christ Jesus. For the Christian to salute a flag is in direct violation of God's specific commandment."

"Almighty God commands that they must remain entirely neutral in the controversy. Because his covenant people are servants and representatives of The Theocracy they must hold themselves entirely aloof from warring factions of this world."

"Non-Christians may salute the flag without reference to the foregoing rules. Those who are real conscientious Christians are in a class entirely different from others of the world. Jehovah's witnesses are Christians and in a covenant to be entirely obedient to God's law. They must teach their children and admonish them to obey God's law, as he has commanded. They are conscientious and they sincerely believe that for them to indulge in the formalism or ceremony of saluting any flag is a violation of God's specific commandment . . ."

Other passages in this literature teach that "the so-called democracies" hold out no hope of peace, security, life or happiness—that the only place of safety is in Theocracy; that if there is a conflict between state law and what Jehovah's witnesses conceive to be Jehovah's law, the state law should not be obeyed; that Jehovah's witnesses take a pledge not to salute the flag and that to undertake by law to force a child to salute the flag is to "fame mischief by law." Appellant justified his attitude

and conduct by quoting on the stand certain passages of the Scriptures and calling attention to other passages therefrom appearing in the literature.

In addition to the foregoing, appellant himself testified that he was an ordained minister. His earthly ordination was evidenced by a printed postcard, containing the printed signature of the Watchtower Bible and Tract Society and its president, and which card has a blank space for the name of the person to be ordained and a blank for the identifying signature of such person. Both of these blanks had been filled in by appellant. Appellant also evidenced his ordination as a minister by referring to certain Scriptural passages. He said he had been a full time Jehovah Witness for twelve years; that he came to Mississippi from Alabama and had been here some three months; that he had contacted many of the other citizens, white and colored, of Madison County and had sold to them many sets of the literature; that his financial income from this work consisted of the excess of the sale over the cash prices of the literature and as much as $25 per month paid him by said society, "upon our getting in so much time. If we don't work we don't eat;" that there were one hundred and forty-four thousand such workers in the United States; that the workers were under a superintendent; that he was not a pacifist and he loves his country; that he was in the Army in the last World War on duty in Honolulu, and after having served about eighteen months he purchased his release therefrom by paying "the government $140."

Placing these words and acts against the statute, it will be seen that they may be reasonably construed to violate it in these respects: (1) that they are calculated to encourage disloyalty to the Governments of the United States and of Mississippi, and discourage enlistment in the armed forces of the Nation; (2) that they advocate the cause of the enemies of the United States;

and (3) that they reasonably tend to create an attitude of stubborn refusal to salute, honor, or respect the flag or government of the United States. Assuming the validity of the law, we think the evidence is sufficient to support the verdict of the jury.

Appellant contends that this statute is unconstitutional as to him because it deprives him of the right of free speech and free press guaranteed by the Constitutions of Mississippi and the United States. Const. Miss. 1890, sec. 13; Const. U. S. Amend. 1. The act, as an entirety, is sufficiently comprehensive in its objects, including, for instance, sabotage and acts of violence against the sovereign, to meet this constitutional attack, but the question is whether it is constitutional as applied to appellant and his conduct. The question should be tested by the powers of the sovereign in war-time and the corresponding rights and duties of the people during such time. Even in peace-time the right of free speech does not mean unbridled license of speech. The right may be abused, for which abuse punishment may be meted out under the police power of the state. The Constitution protects the right but not the abuse. For instance, one has no right even in times of peace to use language, oral or written, which wrongfully injures another in person or property, or tends to corrupt public morals, induce crime, endanger the public safety, or which advocates a change in industrial conditions or the form of government by use of force, violence or other unlawful means. State v. Quinlan, 86 N. J. L. 120, 91 A. 111; State v. Boyd, 86 N. J. L. 75, 91 A. 586, affirmed 87 N. J. L. 328, 93 A. 599; State v. Fox, 71 Wash. 185, 127 P. 1111, affirmed in 236 U. S. 273, 35 S. Ct. 383, 59 L. Ed. 573; People v. Most, 171 N. Y. 423. 64 N. E. 175. 58 L. R. A. 509; State v. Gibson, 189 Iowa 1212, 174 N. W. 34; State v. Tachin, 92 N. J. L. 269, 106 A. 145. affirmed 93 N. J. L. 485, 108 A. 318; State v. Gabriel, 95 N. J. L. 337, 112 A. 611; People v. Gitlow, 195 App. Div. 773, 187 N. Y. S. 783; Ex

parte Moriarity, 44 Nev. 164, 191 P. 360; In re McDermott, 180 Cal. 783, 183 P. 437; People v. Malley, 149 Cal. App. 597, 194 P. 48; People v. Steelik, 187 Cal. 361, 203 P. 78; State v. Worker's Socialist Pub. Co., 150 Minn. 406, 185 N. W. 931; Whitney v. People of State of California, 274 U. S. 357, 47 S. Ct. 641, 71 L. Ed. 1095, affirming 57 Cal. App. 449, 207 P. 698; People v. Wagner, 65 Cal. App. 704, 225 P. 464; People v. Cox, 66 Cal. App. 287, 226 P. 14; Burns v. United States, 274 U. S. 328, 47 S. Ct. 650, 71 L. Ed. 1077; In re Danton, 108 Kan. 451, 195 P. 981; People v. Ruthenberg, 201 Mich. 358, 201 N. W. 358, writ of error dismissed in 273 U. S. 782, 47 S. Ct. 470, 71 L. Ed. 890; Berg v. State, 29 Okl. Cr. 112, 233 P. 497; Commonwealth v. Widovich, 295 Pa. 311, 145 A. 295, affirming 93 Pa. Super. 323, appeal dismissed and certiorari denied 280 U. S. 518, 50 S. Ct. 66, 74 L. Ed. 588. Even so, if this were peace-time legislation, the writer would not hesitate to hold it unconstitutional as to appellant.

But this is one of several statutes passed by the Mississippi Legislature in 1942 to aid in the prosecution of the present war and to meet conditions arising out of the war. The reasons for its enactment are summarized in the preamble. It is an emergency, temporary war act, and by its express terms it will expire upon termination of the war. "When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right." Schenck v. United States, 249 U. S. 47, 39 S. Ct. 247, 248, 63 L. Ed. 470. Again, "To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit of the army may not be broken by seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or

trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; prices of food and other necessities of life fixed or regulated; railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war." United States v. Macintosh, 283 U. S. 605, 51 S. Ct. 570, 574, 75 L. Ed. 1302.

The Espionage Act enacted by Congress in 1917, 40 Stat. at L. 219, Chap. 30 and the amendment thereto in 1918, 40 Stat. at L. 553, Chap. 75, 50 U. S. C. A., sec. 33 note, provide, inter alia, that whoever, when the United States is at war, shall "willfully utter, print, write, or publish any disloyal, profane, scurrilous, or abusive language about the form of government of the United States;" or its Constitution, military or naval forces, flag, or uniform, or any language intended to bring the form of the Government of the United States, or the Constitution, military or naval forces, flag, or uniform, into contempt or disrepute; or "willfully utter, print, write, or publish any language intended to incite, provoke, or encourage resistance to the United States, or to promote the cause of its enemies;" or whoever shall wilfully advocate, teach, defend, or suggest the doing of any of the acts or things enumerated in the statute; or "whoever shall by word or act support or favor the cause of any country with which the United States is at war or by word or act oppose the cause of the United States therein," shall be punished by fine of not more than ten thousand dollars or imprisonment for not more than twenty years, or both. The words of this act are strikingly similar to the state act now under consideration. The Espionage Act, without exception, has been held constitutional as an emergency war act. Frohwerk v.

United States, 249 U. S. 204, 39 S. Ct. 249, 63 L. Ed. 561; Debs v. United States, 249 U. S. 211, 39 S. Ct. 252, 63 L. Ed. 566; Schenck v. United States, 249 U. S. 47, 39 S. Ct. 247, 63 L. Ed. 470; Abrams v. United States, 250 U. S. 616, 40 S. Ct. 17, 63 L. Ed. 1173; United States ex rel. Milwaukee S. D. Pub. Co. v. Burleson, 255 U. S. 407, 41 S. Ct. 352, 65 L. Ed. 704; Dodge v. United States, 2 Cir., 258 F. 300, petition for writ of certiorari denied 250 U. S. 660, 40 S. Ct. 10, 63 L. Ed. 1194, 7 A. L. R. 1510; Equi v. United States, 9 Cir., 261 F. 53, petition for writ of certiorari denied 251 U. S. 560, 40 S. Ct. 219, 64 L. Ed. 414; Wimmer v. United States, 6 Cir., 264 F. 11, petition for certiorari denied 253 U. S. 494, 40 S. Ct. 586, 64 L. Ed. 1030; Dierkes v. United States, 6 Cir., 274 F. 75; Seebach v. United States, 8 Cir., 262 F. 885. In the Schenck case, supra, the court in drawing the distinction between peacetime and war-time legislation said: "We admit that in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their constitutional rights. . . ." In the Dodge case, supra, the court held that the constitutional guarantee of freedom of speech does not extend to the protection of utterances in time of war which involve the integrity of the nation or injure or tend to injure it.

A number of the states have passed sedition acts, some during the last World War and some in peace-time, having for their general object the curtailment of speech and action tending to create hostility to or the undermining of state and national governments. Some of these have been held unconstitutional as denying freedom of speech, or on other grounds; others have been held constitutional.

The Connecticut Statute (Chap. 312, Laws 1919) penalized disloyal or abusive matter concerning the form of government of the United States, its military forces, flag, or uniform, or any matter which was intended to bring them into contempt. This was held not to violate the right of free speech and was a subject within the

police power of the state. State v. Sinchuck, 96 Conn. 605, 115 A. 33, 20 A. L. R. 1515.

The Iowa Statute (Acts 37th Gen. Assem. chap. 372) provides (1) that if any person shall incite insurrection or sedition etc. or shall attempt, by word or writing or other means, to do that; or (2) shall, by speech or writing or other means, advocate the subversion or destruction by force the government of the state or the United States; or (3) who shall by any method incite, abet or encourage hostility or opposition to either government, he is guilty of a crime. This did not abridge the right of freedom of speech. State v. Gibson, 189 Iowa 1212, 174 N. W. 34.

The Montana Statute, Laws 1918, Ex. Sess., chap. 11, declared that whenever the United States is at war any person who shall utter, print, write, or publish any language calculated to incite or inflame resistance to any duly constituted Federal or state authority in connection with the prosecution of the war, shall be guilty of a criminal offense. The act has been held constitutional in a number of state decisions. State v. Kahn, 56 Mont. 108, 182 P. 107; State v. Wyman, 56 Mont. 600, 186 P. 1; State v. Smith, 57 Mont. 563, 190 P. 107; State v. Fowler, 59 Mont. 346, 196 P. 992, rehearing denied 59 Mont. 346, 197 P. 847; State v. Schaffer, 59 Mont. 463, 197 P. 986, and in Ex parte Starr, 9 Cir., 263 F. 145.

The New Jersey Court upheld the section of the law which made it a penal offense to advocate the subversion of the government by force, P. L. 1918, p. 130, sec. 2, N. J. S. A. 2:173-13, but denied validity to the provision making it such an offense to belong to an organization or attend meetings having for their purpose encouraging hostility or opposition to the state or national government, section 3, N. J. S. A. 2:173-14, because the wording of the latter section covered the use of lawful as well as unlawful means. State v. Tachin, 92 N. J. L. 269, 106 A. 145, affirmed 93 N. J. L. 485, 108 A. 318. This appears

to have been a peacetime statute and is in accord with the holdings generally under such statutes, as shown above.

Likewise the New York Statute, involving attempt to overthrow the government by force or violence, or other unlawful means, and the advocacy thereof by word or writing was upheld in Gitlow v. People of State of New York, 268 U. S. 652, 45 S. Ct. 625, 69 L. Ed. 1138, affirming 234 N. Y. 132, 136 N. E. 317; Id., 234 N. Y. 539, 138 N. E. 438; and People v. American Socialist Society, 202 App. Div. 640, 195 N. Y. S. 801. This was peace-time legislation (Penal Law, secs. 160, 161, Laws 1909, Chap. 88, originally enacted in 1902, Laws 1902, chap. 371).

But the prohibition of the use of disloyal language per se, in a Texas statute, Acts 35th Leg., 4th Called Sess., chap. 8, sec. 1, Vernon's Ann. P. C., art. 155 as a war measure, was held to be a subject exclusively of Federal legislation, and not within the scope of state legislation, and was not within the police power of the state and violated the right of free speech, on the ground that the statute was so worded as to penalize one who uttered language of such nature, whether it was used under such circumstances as to make it reasonably provocative of a breach of the peace or not. Ex parte Meckel, 87 Tex. Cr. R. 120, 220 S. W. 81; Schellenger v. State, 87 Tex. Cr. R. 411, 222 S. W. 246.

Also, the Illinois Statute, Laws 1919, p. 420, Smith-Hurd Stats., chap. 38, sec. 558 et seq., limited the means to force or violence and was upheld as peacetime legislation. People v. Lloyd, 304 Ill. 23, 136 N. E. 505; and likewise an act of the State of Pennsylvania, requiring force or violence and intent, Com. v. Widovich, 295 Pa. 311, 145 A. 295, affirming 93 Pa. Super. 323, appeal dismissed and certiorari denied 280 U. S. 518, 50 S. Ct. 66, 74 L. Ed. 588.

We now turn to authorities more directly in point on the question under consideration.

Chapter 463, Laws of Minnesota, approved April 20, 1917, a war act, in the first section thereof, made it. an offence to advocate, or attempt to advocate, by word or writing, that men should not enlist in the military or naval forces of the United States, and the second section thereof provided: "It shall be unlawful for any person to teach or advocate by any written or printed matter whatsoever, or by oral speech, that the citizens of this state should not aid or assist the United States in prosecuting or carrying on war with the public enemies of the United States." Holm was charged with circulating a pamphlet containing statements "this war was arbitrarily declared against the will of the people;" that the people are ten to one against it; that "the President and Congress have forced this war upon the United States," and are attempting by conscription to "force us to fight a war to which we are opposed;" that "this war was declared to protect the investments of Wall street in the bonds of the Allies." Holm said he was exercising his right of free speech. The court said that he had abused the right—". . . the freedom secured thereby is not an unlimited license to speak and to publish whatever one may choose. It is settled that the state may prohibit publications or teachings which are injurious to society, or which tend to subvert or imperil the government or to impede or hinder it in the performance of its public and governmental duties without infringing the constitutional provisions which preserve freedom of speech and of the press;" that the right does "not grant immunity to those who abuse this privilege, nor prevent the state from making it a penal offense to publish or advocate matters or measures inimical to the public welfare." State v. Holm, 139 Minn. 267, 166 N. W. 181, 183, L. R. A. 1918C, 304.

In State v. Gibson, 189 Iowa 1212, 174 N. W. 34, 35, the indictment charged that defendant "did attempt by speech, action, and manner of speaking to incite, abet,

promote and encourage hostility and opposition to the government of the state of Iowa and of the United States,'' contrary to the sedition act of Iowa. The statute is summarized above herein. The court held right of free speech was abused, saying the framers of the Constitution ''did not intend to protect what might destroy the state.''

In State v. Kahn, supra, Kahn, used this language: ''This is a rich man's war, and we have no business in it. They talk about Hooverism—it's a joke. Nobody pays any attention to it. It don't amount to anything. The Lusitania was warned not to sail. They were carrying munitions and wheat over for the Allies. The poor man has no show in this war. The soldiers are fighting the battles of the rich.''

The court said: ''In time of peace the language employed by this defendant, or language of similar import, might not constitute a crime, and it may be true that it is beyond the power of the Legislature to make its use a crime in the time of peace . . . As said by the Supreme Court of the United States: 'When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight, and that no court could regard them as protected by any constitutional right,' '' citing the Schenck, Frohwerk and Debs cases, supra.

In the Gilbert case, Gilbert v. State of Minnesota, 254 U. S. 325, 41 S. Ct. 125, 65 L. Ed. 287, the State of Minnesota had a statute making it unlawful to advocate that men should not enlist in the armed services of the United States and also ''for any person to teach or advocate by any written or printed matter whatsoever, or by oral speech, that the citizens of this state should not aid or assist the United States in prosecuting or carrying on war with the public enemies of the United States.'' Gen. St. Supp. 1917, sec. 8521-3. Gilbert said: ''We are

going over to Europe to make the world safe for democracy, but I tell you we had better make America safe for democracy first. You say, what is the matter with our democracy? I tell you what is the matter with it: Have you had anything to say as to who should be President? Have you had anything to say as to who should be Governor of this state? Have you had anything to say as to whether we would go into this war? You know you have not. If this is such a good democracy, for Heaven's sake why should we not vote on conscription of men? We were stampeded into this war by newspaper rot to pull England's chestnuts out of the fire for her. I tell you if they conscripted wealth like they have conscripted men, this war would not last over forty-eight hours.'' In overruling the contention that Gilbert was properly exercising his right of freedom of speech, the Supreme Court of the United States, speaking through Mr. Justice McKenna said: ''It [the right] is not absolute; it is subject to restriction and limitation. And this we have decided in Schenck v. United States [supra]. We distinguished times and occasions, and said that 'the most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic' ''; also that in the Frohwerk case, supra, the Court said ''the First Amendment, while prohibiting legislation against free speech as such, cannot and obviously was not intended to give immunity to every possible use of language,'' citing also the Debs and Abrams cases, supra, and Schaefer v. United States, 251 U. S. 466, 40 S. Ct. 259, 64 L. Ed. 360, where it was said that the curious spectacle was presented of the Constitution of the United States being invoked to justify the activities of the enemies of the United States. The conviction was sustained because we were then, as now, at war with Germany.

So far, we have not dealt with the question of the flag. We do that now.

In Ex parte Starr, 9 Cir.; 263 F. 145, a state statute making it an offense to utter or publish slurring language about the flag was held valid.

In Commonwealth v. Karvonen, 219 Mass. 30, 106 N. E. 556, L. R. A. 1915B, 706, Ann. Cas. 1916D, 846, the court upheld a statute making it unlawful to carry in a parade a red or black flag or banner having upon it an inscription opposed to organized government, which is sacrilegious, or derogatory to public morals.

In People v. Burman, 154 Mich. 150, 117 N. W. 589, 25 L. R. A. (N. S.) 251, the court upheld a municipal ordinance prohibiting the display of a red flag in a procession where it is likely to disturb the public peace.

On the other hand, a California court held invalid a municipal ordinance which made it unlawful to display, or to have in possession, a flag of any society or association which espoused principles or theories antagonistic to the United States or its Constitution, because this included an effort to change the form of government by peaceful means. Ex parte Hartman, 182 Cal. 447, 188 P. 548.

In People v. Lloyd, 304 Ill. 23, 136 N. E. 505, the court upheld a statute prohibiting, inter alia, the display of a flag at a public meeting, or in a parade, intending thereby to overthrow the government by force or violence.

In State v. Sinchuk, 96 Conn. 605, 115 A. 33, 20 A. L. R. 1515, a statute was held valid which provided, among other things, that it was an offense to publish matter abusive or disloyal of the form of government or the flag.

The Supreme Court of the United States in Stromberg v. People of State of California, 283 U. S. 359, 51 S. Ct. 532, 75 L. Ed. 1117, 73 A. L. R. 1484, held invalid a statute which made it an offense to display a flag at a public assembly "as a sign, symbol or emblem of opposition to organized government or as an invitation or stimulus to anarchistic action or as an aid to propaganda that is of a seditious character," Pen. Code Cal., sec. 403a, be-

cause it might be construed to include peaceful and orderly opposition to government by legal means and within constitutional limitations.

In Minersville School District v. Gobitis, 310 U. S. 586, 60 S. Ct. 1010, 84 L. Ed. 1375, 127 A. L. R. 1493, the Supreme Court of the United States upheld a school regulation requiring all pupils to salute the American flag as a part of the daily school exercises, and providing that refusal to salute the flag should be regarded as an act of insubordination and dealt with accordingly.

Similar state statutes, or school regulations, were upheld in People ex rel. Fish v. Sandstrom, 279 N. Y. 523, 18 N. E. (2d) 840, 120 A. L. R. 646; Leoles v. Landers, 302 U. S. 656, 58 S. Ct. 364, 82 L. Ed. 507, dismissing appeal from 184 Ga. 580, 192 S. E. 218; Hering v. State Bd. of Ed., 303 U. S. 624, 58 S. Ct. 752, 82 L. Ed. 1087, dismissing appeal from 118 N. J. L. 566, 194 A. 177; Gabrielli v. Knickerbocker, 12 Cal. (2d) 85, 82 P. (2d) 391; and Nicholls v. Mayor and School Committee of Lynn, 297 Mass. 65, 7 N. E. (2d) 577, 110 A. L. R. 377. The District Court of the United States, Southern District of West Virginia, in the case of Barnette et al. v. West Virginia State Board of Education et al. (D. C.), 47 F. Supp. 251, speaking through Judge Parker, has aligned that court with the cases holding invalid rules of school boards requiring school children to salute the flag. The last six cases involve children of Jehovah Witnesses. These cases are persuasive, not decisive, on this question, because, with the exception of the Starr case, they involve permanent, peace-time rules and statutes commanding affirmative action by defendants, whereas the Mississippi Statute is temporary, emergency war-time legislation to restrain affirmative teaching and action operating upon and to the detriment of others, and to the injury of the general public.

The importance and far-reaching import of the attitude of appellant towards the flag, as disclosed by the evi-

dence herein, are shown by the statements of Mr. Justice Harlan in Halter v. State of Nebraska, 205 U. S. 34, 27 S. Ct. 419, 422, 51 L. Ed. 696, 10 Ann. Cas. 525: ". . . a state will be wanting in care for the well-being of its people if it ignores the fact that they regard the flag as a symbol of their country's power and prestige, and will be impatient if any open disrespect is shown towards it. . . . that to every true American the flag is the symbol of the nation's power,—the emblem of freedom in its truest, best sense. It is not extravagant to say that to all lovers of the country it signifies government resting on the consent of the governed; liberty regulated by law; the protection of the weak against the strong; security against the exercise of arbitrary power; and absolute safety for free institutions against foreign aggression."

Our nation is now in a war of self-defense for self-preservation. Freedom of speech is not the only, nor the most important, constitutional right of the citizens of this country. The constitution provides that no law shall be passed impairing the obligation of contract; yet under the moratorium laws and Soldiers' and Sailors' Civil Relief Act, 50 U. S. C. A. Appendix, sec. 501 et seq., no security contract can be enforced against one in the military service; and lease and rental contracts between civilians in war areas are subject to approval and change by national administration officials regardless of the assent of lessors. The Constitution provides that the courts shall be open to all persons, yet under that act no legal proceeding can be prosecuted to completion, except under unheard of peace-time restrictions and limitations. Under the war power acts and Inflation Emergency Price Control Acts, the entire financial and living fabric of the Nation is being woven to best aid in the prosecution of the war, regardless of individual rights. The Constitution provides that life and liberty shall not be taken without due process of law, yet under

the Selective Training and Service Act of 1940, 50 U. S. C. A., sec. 301 et seq., the people are inducted into the military service, willingly or unwillingly, and we judicially know that the lives of many of them are being given for their country on the sands of Africa and in the jungles of New Guinea and in other foreign countries. A nation must have inherently the power to save itself. If all individual constitutional rights were maintained, the Nation could not defend itself. The rights of the citizens must give way temporarily as this may be reasonably necessary for the Nation's self-preservation.

The act has two objects: Aid in prosecuting the war and dealing with local conditions arising out of the war. This is a war of all the people—not those in the military service alone. The spirit and morale of the people; their willingness to help financially and by personal effort; their support of, belief in, and respect for the government are essential to its successful prosecution. The legislature knew the local conditions—that we have two races about equal in numbers in this state, and that under the stress of the time agitation and subversive influences should not be abroad among the people. The legislature is the judge of conditions justifying such legislation unless it is clearly apparent to the court that the assumption is unfounded. State v. Sinchuk, supra. This is not the usual political discussion, with a view, by commendation or criticism, to aid or better the government and its administration. ''Words are not only the keys of persuasion, but the triggers of action, and those which have no purport but to counsel the violation of law cannot by any latitude of interpretation be a part of that public opinion which is the final source of government in a democratic state.'' Masses Pub. Co. v. Patten (D. C. S. D. N. Y.), 244 F. 535, 540. Appellant and his co-workers are going about the country and into the homes of the people, of low and high degrees of intelligence, and all races, advocating disobedience to all laws and disrespect for

and disloyalty to all governments, if perchance the particular law or the nature of the government in his opinion is not in accord with Theocracy. And this at a time when the nation is straining every nerve, muscle and sinew, and mobilizing every resource and person, to defend itself against a treacherous attack of one and the evil designs of all of its enemies. We draw a sharp line between war and peace time powers, and hold that under the conditions the legislature had the right, under its police powers, to enact this statute, and it does not violate the right of free speech and free press of appellant.

Appellant next earnestly contends that he is deprived of freedom of worship. It is true that freedom of worship includes freedom to believe and freedom to act, the first of which is absolute, ''but, in the nature of things, the second cannot be.'' ''Conduct remains subject to regulation for the protection of society.'' Cantwell v. Connecticut, 310 U. S. 296, 60 S. Ct. 900, 903, 84 L. Ed. 1213, 128 A. L. R. 1352. But in this case the right is asserted on a false assumption. There is no conflict between the right to worship, including the teaching of such worship, and loyalty to the flag and government of one's country. The Constitution does not define religion. Reynolds v. United States, 98 U. S. 145, 25 L. Ed. 244. Appellant professes the religion of Christianity. Without undertaking a definition, the Christian religion, in its most important ultimate aspect, recognizes, has faith in and worships a Divine Being or Spirit—one Father of all mankind—who has the power to and will forgive the transgressions of repentants and care for the immortal souls of the believers, and which belief brings earthly solace and comfort to and tends to induce right living in such believers. Its primary object is a haven of rest after ''life's fitful fever is over.'' It is a fallacy of the rankest kind to assume that loyalty to one's country and its flag is attributing to them any aspect of divinity or omnipotent power. Since the days of barbarism and

savagery, it has been necessary that people live in organized society. Law, order, institutions, the earthly existence of the people, depend upon some organization. But these are earthly—for the protection here of mankind. They have nothing to do with divinity or immortality. Jesus himself announced that almost two thousand years ago. When the spies, seeking to entrap him, asked "Is it lawful for us to give tribute unto Caesar, or no?," He replied "Render therefore unto Caesar the things which be Caesar's and unto God the things which be God's." Luke XX:22, 25. As was said in Nicholls v. Mayor and School Committee of Lynn, 297 Mass. 65, 7 N. E. (2d) 577, 580, 110 A. L. R. 377: " 'The term "religion" has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to His will. . . . With man's relations to his Maker and the obligations he may think they impose, and the manner in which an expression shall be made by him of his belief on those subjects, no interference can be permitted, provided always the laws of society, designed to secure its peace and prosperity, and the morals of its people, are not interfered with.' The flag salute and pledge of allegiance here in question do not in any just sense relate to religion. They are not observances which are religious in nature. They do not concern the views of any one as to his Creator. They do not touch upon his relations with his Maker. They impose no obligations as to religious worship. They are wholly patriotic in design and purpose. . . . The pledge of allegiance to the flag . . . is an acknowledgment of sovereignty, a promise of obedience, a recognition of authority above the will of the individual, to be respected and obeyed. It has nothing to do with religion. . . . There is nothing in the salute or the pledge of allegiance which constitutes an act of idolatry, or which approaches to any religious observance."

The doctrine is preached by this appellant that the laws of the land should not be obeyed if they conflict with what the believer thinks is the law announced by Jehovah. This would sanctify the reasons for disobeying all human law, regardless of the soundness of the reasons, selecting passages here and there from the Bible, and lifting them out of their context and setting to support the belief. This would result, as in the past it has resulted, in not obeying the law against taking human life if the taker thought such taking justified (United States v. Macintosh, 283 U. S. 605, 51 S. Ct. 570, 75 L. Ed. 1302, 1303); in the justification of bigamy if defendant thought bigamy was right. Davis v. Beason, 133 U. S. 333, 10 S. Ct. 299, 33 L. Ed. 637. History discloses sects which, as a part of their religious tenets, advocate that there should be no marriage ties, approving promiscuous intercourse between the sexes as prompted by the passions of their members, and as part of their ritual the sacrifice of human beings. That subordinates the authority of the state to the whims of each individual. Such a doctrine is utterly destructive of human society and laws. See the old (1854) but leading case of Donahoe v. Richards, 38 Me. 379, 61 Am. Dec. 256. As bearing upon the religious question, but not necessarily as an approval of the rules and holding therein, we cite Jones v. City of Opelika (Bowden v. City of Ft. Smith), 316 U. S. 584, 62 S. Ct. 1231, 86 L. Ed. 1691, 141 A. L. R. 514; Commonwealth v. Anderson, 272 Mass. 100, 172 N. E. 114, 69 A. L. R. 1097; cases in note 114 A. L. R. 1452.

This statute is directed at affirmative action—action upon others.

Mention is made of the exemption from military service of conscientious objectors. The suggestion is not relevant to the point but it might be remarked that such exemption is based on a policy of Congress and not upon a constitutional right. Application for citizenship was denied applicants in the Macintosh and Reynolds case,

supra, because the applicants were not willing to fight to preserve their country. The right of freedom of religion is not involved in this case.

Appellant says he cannot be held guilty under the proof here because it fails to show a clear and present danger of accomplishing the evils which are the objects of the statute. The Espionage Statute, as construed, does so require. Schenck and Frohwerk cases, supra. The state sedition acts appear not to do so, as a rule. Gitlow case, supra. The Mississippi statute does not do that. That was not necessary to its validity. State v. Sinchuk, supra. But if the state statute did so require, we think the proof here sufficient to meet the requirement. The utterances, the circumstances and the objects are all to be considered. The utterances, oral and written together, are certainly calculated to create disloyalty to the state and national governments and reasonably tend to create an attitude of stubborn refusal to salute the flag. ''If the act (speaking, or circulating a paper), its tendency and the intent with which it is done are the same, we perceive no ground for saying that success alone warrants making the act a crime.'' Schenck v. United States, supra; Goldman v. United States, 245 U. S. 474, 477, 38 S. Ct. 166, 62 L. Ed. 410.

It is true the listeners in this case who testified said this was not the result upon them; that they had a feeling of resentment against appellant. But in later days, when adversities of war may become more acute, who can say what their reactions may be? Besides, the proof is that appellant has gone about to the homes of many citizens, of different stations in life and degrees of literacy and intelligence, and of all the races existing in this state— these, or some of them, may, and no doubt have, reacted to the natural result of these spoken and written words. Again, an attitude of disloyalty and disrespect to the flag and the government is not likely to be shown immediately in some overt act evidencing such attitude.

This is fruit to be produced after gradual growth and maturity from the evil seeds which have been sown.

Appellant contends the statute is not valid because it prescribes no ascertainable standard of its violation. The 1918 amendment to the Espionage Act used the expression "promote the cause of its enemies . . . bring the flag into disrepute . . . or advocate any curtailment of production in this country of any thing or things . . . necessary or essential to the prosecution of the war . . . cause disloyalty . . . in the military or naval forces of the United States; . . ." The various sedition statutes use such expressions as "advocate, encourage—incite—to encourage or advocate disrespect for law;" conspiracy to intimidate any citizen in the free enjoyment of any right or privilege under the Constitution; any matter which creates or fosters opposition to organized government, or intended to bring the flag or government into contempt—these and other like expressions have been held to prescribe sufficiently the standard of conduct to meet the requirements of due process of law. State v. Boyd; State v. Fox; State v. Sinchuk; Whitney v. State, supra; Burns v. United States, 274 U. S. 328, 47 S. Ct. 650, 71 L. Ed. 1077; People v. Lloyd, supra. It was said in Sproles v. Binford, 286 U. S. 374, 52 S. Ct. 581, 585, 76 L. Ed. 1167: "To make scientific precision a criterion of constitutional power would be to subject the state to an intolerable supervision hostile to the basic principles of our government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure." "Disloyalty" to the state or nation, or "advocates the cause of the enemies" are expressions found in the Espionage Act and the State Sedition Statutes and those state statutes intended to aid in prosecuting the war. But it is said the adjective "stubborn" before the word "refusal" to salute, honor or respect the flag renders the Mississippi Statute void in respect to the idea under

discussion. The Standard Dictionary of the English Language defines stubborn as "inflexible in opinion or intention; unreasonably obstinate; not easily bent, set aside or overcome; perseverance; persistence." Aside from the other elements contained in the statute, it can readily be understood why the jury might conclude that what was said and done here, and the reasons behind the arguments, would reasonably cause such refusal to salute, honor or respect the flag. That is conclusively shown in the cases above cited where children of the members of this sect choose to be expelled from school rather than salute the flag. There were children present on the occasion at the home of Mrs. Joyner. Illustrations of vagueness and indefiniteness are set out in note 70 L. Ed. 322. The question is not without doubt, but we do not think this law is invalid on this ground.

The suggestion is made that the offense here prescribed, if any, is treason, and punishable only according to the provisions of Article 3, Section 3, of the Constitution of the United States, and the state has no authority to legislate thereon. In the cases where this contention has been made, it has been overruled. State v. Hennessy, 114 Wash. 351, 195 P. 211; State v. Hestings, 115 Wash. 19, 196 P. 13; State v. Hemhelter, 115 Wash. 208, 196 P. 581; Equi v. United States, 9 Cir., 261 F. 53, 171 C. C. A. 649; Frohwerk v. United States, supra; Wimmer v. United States, 6 Cir., 264 F. 11; Schoborg v. United States, 6 Cir., 264 F. 1, petition for certiorari denied 253 U. S. 494, 40 S. Ct. 586, 64 L. Ed. 1029; Berg v. State of Oklahoma, 29 Okl. Cr. 112, 233 P. 497.

The contention is furthermore made that the State of Mississippi had no power to enact this statute because Congress has legislated upon the same field. It is evident that as to some objects of the statute Congress has not legislated thereon, but, even if that should be true, that would not deprive the state of the power to enact this enabling legislation. See the various cases cited above

under state sedition statutes, and especially State v. Holm; State v. Gibson; State v. Kahn; Commonwealth v. Widovich; Gilbert v. State of Minnesota, supra; State v. Fowler, 59 Mont. 346, 196 P. 992; Halter v. Nebraska, supra; Noble State Bank v. Haskell, 219 U. S. 104, 31 S. Ct. 186, 55 L. Ed. 112, 116, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487; also note L. R. A. 1918C, 307. In the Holm case, the court in dismissing the contention that the Espionage Act had superseded the Minnesota Statute, making it unlawful for any person to teach or advocate that any citizen of that state should not aid in the prosecution of the last World War, said: "The citizens of the state are also citizens of the United States and owe a duty both to the state and to the United States. The state is a part of the nation and owes a duty to the nation to support, in full measure, the efforts of the national government to secure the safety and protect the rights of its citizens and to preserve, maintain, and enforce the sovereign rights of the nation against the public enemies, and to that end the state may require its citizens to refrain from any act which will interfere with or impede the national government in effectively prosecuting the war against such public enemies. It is the duty of all citizens of the state to aid the state in performing its duties as a part of the nation, and the fact that such citizens are also citizens of the United States and owe a direct duty to the nation does not absolve them from their duty to the state nor preclude the state from enforcing such duty." In Halter v. Nebraska, supra, the Supreme Court of the United States, speaking through Mr. Justice Harlan, said: ". . . a state may exert its power to strengthen the bonds of the Union, and therefore, to that end, may encourage patriotism and love of country among its people. When, by its legislation, the state encourages a feeling of patriotism towards the nation, it necessarily encourages a like feeling towards the state. One who loves the Union will love the state in

which he resides, and love of both of the common country and of the state will diminish in proportion as respect for the flag is weakened . . ."

We do not pass upon whether the existence of intent in the accused to bring about the objects condemned by the statute is an essential element under the statute or whether, to be valid, the statute must so provide, for the reason that under the instructions of both the state and appellant such intent was made a prerequisite to guilt, and its existence or nonexistence was a fact submitted to the jury, and it necessarily found that such intent did exist. We think under all the proof and circumstances here the jurors, as reasonable men, could have found on that question as they did find.

Appellant complains of the refusal of the court to grant him certain requested instructions. We have examined the instructions and reviewed appellant's discussions thereof, and are of the opinion the lower court correctly refused all of them except instruction number four, and that, while this instruction correctly announces theoretical law, it was not applicable to the entire case made out herein, and, in view of the many other instructions granted appellant, could not have resulted in appreciable harm to him, and it is, therefore, not reversible error.

As temporary, emergency, war legislation, we think this statute is valid, and that the conviction of appellant must be upheld.

Affirmed.

**Alexander, J.,** delivered a dissenting opinion.

I am constrained to believe that the equal division of opinion herein is not due to a divergence of views as to the applicable law, but rather to an application of the law. A lack of unanimity results from the relative importance attached respectively to the war effort as a temporary but sacrificial means, and to personal liberty

which is its sacred end. I must confess that I see a greater danger to free speech from the controlling opinion than I can find to the war effort by the frail opinions of appellant whose inconsequence is attested by the revulsion awakened in his accusers. Nor can I detect any menace to our democratic institutions in the abstruse writings in the disseminated literature whose esoteric complexities transcend the comprehension of those who would be the likeliest to succumb to simple sophistries or who would most readily find incompatible a loyalty both to God and to country. While this literature is cast in a religious mold and propagated as a religious creed, I do not feel it necessary to invoke the right of religious freedom to justify my dissent. Literature of the type and content here exhibited has been many times held not to be hurtful to the morals or the general welfare nor seditious in character. State v. Meredith, 197 S. C. 351, 15 S. E. (2d) 678; Donley v. City of Colorado Springs, D. C., 40 F. Supp. 15; People v. Northum, 41 Cal. App. (2d) 284, 106 P. (2d) 433; Zimmerman v. Village of London, D. C., 38 F. Supp. 582; Oney v. Oklahoma City, 10 Cir., 120 F. (2d) 861; State v. Aspelin, 118 Wash. 331, 203 P. 964.

In the dissent in Cummings v. State, 194 Miss. 59, 11 So. (2d) 683, this day decided, it was thought not inappropriate to review familiar but fundamental constitutional principles, which, because elemental, are too infrequently rehearsed.

In declaring their freedom, the founders of our republic sought to justify in their course "a decent respect to the opinions of mankind." Its continued prosperity is not to be achieved by withholding a like respect for the opinions of its own kind. The state is never called upon to indulge in mere resentment. It has no standard save the morals, peace, and safety of its people. Miss. Const., Sec. 18. The federal courts have no common-law jurisdiction of what is a mere slander or libel against the

United States in a supposed violation of the peace and dignity of its sovereign power. United States v. Hudson, 7 Cranch, 32, 3 L. Ed. 259. A fortiori the state courts have not. The shore line which marks the ceaseless conflict between the tides of tyranny and the coasts of democracy suffers a fluctuating fate. There are times of high threat and seasons of ebbing power. It was but natural that there should recur periods of definite invasion and recession due to local and transitory influences. At epic intervals the tides are suddenly and effectively thrust back by the downrushing collapse of orderly democracy whose sustaining patience is undermined by the ruthless erosion of gradual and persistent encroachment, and freedom extends its frontiers in a veritable cataclysm of revolution. Only when the state has laid down its seawall of positive law can it say to the citizen, "Thus far shall thou go and no farther." But such bulwark is given permanent stability only when reinforced with the requirement that its limitation be marked by an actual overthrow by force or violence. State v. Aspelin, supra; McKee v. State, 219 Ind. 247, 37 N. E. (2d) 940; Bridges v. California, 314 U. S. 252, 62 S. Ct. 190, 86 L. Ed. 192. "The danger line . . . is reached when one strikes at the very foundation of organized society by inciting rebellion in an attempt to destroy it." Commonwealth v. Widovich, 295 Pa. 311, 145 A. 295, 298, certiorari denied, 280 U. S. 518, 50 S. Ct. 66, 74 L. Ed. 588. "The evil itself must be 'substantial,' . . . it must be 'serious' . . . And even the expression of 'legislative preferences or beliefs' cannot transform minor matters of public inconvenience or annoyance into substantive evils of sufficient weight to warrant the curtailment of liberty of expression." (Citing authority.) Bridges v. California, supra [314 U. S. 252, 62 S. Ct. 193, 86 L. Ed. 192]. An ultimate result envisaged by an advocate and by him however hopefully predicted or zealously espoused is too vague and indefinite to constitute that

"clear and present danger" to peace, morals, and safety which justifies judicial restraint of this freedom. Fiske v. Kansas, 274 U. S. 380, 47 S. Ct. 655, 71 L. Ed. 1108; De Jonge v. State of Oregon, 299 U. S. 353, 57 S. Ct. 255, 81 L. Ed. 278; Stromberg v. People of State of California, 283 U. S. 359, 51 S. Ct. 532, 75 L. Ed. 1117, 73 A. L. R. 1484; Near v. State of Minnesota, 283 U. S. 697, 51 L. Ed. 625, 75 L. Ed. 1357; Schenck v. United States, 299 U. S. 47, 39 S. Ct. 247, 63. L. Ed. 470; State v. Sentner, 230 Iowa 590, 298 N. W. 813.

The majority opinion asserts that freedom of speech is not the most important constitutional right of the citizen. Avoiding direct dispute, it is nevertheless appropriate to consider whether it is not in fact the keystone of the arch through which our people have passed and through which posterity is to pass in its pursuit of happiness. Of the "four freedoms" of late enunciated as essentials of the American way of life, all involve freedom of expression. Freedom from want implies freedom to voice our needs; freedom from fear assumes a freedom to cry out if need be; freedom of religion involves the freedom to hear, to think, and to teach. The freedom from fear must include freedom from any basis for fear that forces both without and within our borders may destroy or impair fundamental liberties. This is indispensable in a democracy if the other freedoms are to be vouchsafed self-expression. Historical reference confirms the observation that democracies not only are fearful for their liberties, but in no unreal sense fear liberty. The people free to choose their form of government are left free to work out their own political "salvation in fear and trembling." But it is more important that they are free to work it out than that they must do so under fear. A citizenship which is immoderately apprehensive for its powers and their hazards is apt to define unity in terms of unanimity and to manifest its fears in an unreasoning tendency to crush divergent ideas by the sheer weight of

majority power. Zeal is apt to be an outstanding attribute of the minority, while intolerance is best nurtured in a dominating majority which would better exhibit its confidence in a democratic way of life by a patriotism which includes both confidence and courage. Courts should, if necessary, borrow such courage from the one and vigilance from the other, for it is that other whose fears are enhanced by the menace of destruction, and which finds more frequent occasion to raise the banner of freedom to justify its cause and to wield its sword in its defense. Liberty is not self-executing. ''The secret of liberty is courage. A certain penumbra of contingent anarchy always confronts the state but this is entirely desirable since the secret of liberty is always, in the end, the courage to resist.'' Laski, Liberty in the Modern State, p. 80. It is seen, therefore, that public policy is after all a political consensus in which the ideals and prejudices of the individual become pertinent data. Courts should not attempt to imprison human personality, nor immure the creatures of conscience within its own sanctuary. We find here the spectacle of a citizen, who having released from this novel bondage a few despised opinions, is judicially held as hostage for a period which could extend for ten years. We must train our anxieties, therefore, not only upon a fancied future effect of appellant's utterances, but upon the present effect of suppressing his right to speak.

This court would display neither courage nor viligance in refusing to mask itself against prejudices so thoroughly diffused as to become atmospheric, lest it as a defender of constitutional liberty constitute itself an accessory to intolerance. Nor may it import into the discussion any matters save those presented by the record. In the arena of political discussion, it is more often the persecuted minorities who are the aggressors, and who as complainants seek the courts, which, as unbiased champions of their rights, must assume, if only to ignore,

the irrelevant possibility that in the midst of arms the laws are apt to be silenced by an unwonted clamor and that the barbed barricades which a war hysteria erects against the following of its prescribed course will not deal less kindly with judicial vestments. "A court in the discharge of duty under our system is required to be oblivious to public clamor, partisan demands, notoriety, or personal popularity and to interpret the law fearlessly and impartially so as to promote justice, inspire confidence and serve the public welfare." State ex rel. Wilson v. Russell, 146 Fla. 539, 1 So. (2d) 569, 570. "Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth. Noxious doctrines in those fields may be refuted and their evil averted by the courageous exercise of the right of free discussion." Thornhill v. State of Alabama, 310 U. S. 88, 60 S. Ct. 736, 741, 84 L. Ed. 1093.

I approve also the language of Justice Brandeis in his concurring opinion in Whitney v. People of State of California, 274 U. S. 357, 375, 47 S. Ct. 641, at page 648, 71 L. Ed. 1095, when it was said: "Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion."

"Since the general civilization of mankind I believe there have been more instances of the abridgement of the freedom of the people by the gradual and silent encroachments of those in power than by violent and sudden usurpation." Madison, Speech in Va. Convention, June 16, 1778. Later echoes are heard in the statement by

R. Y. Hayne in the debate with Webster: "There are two distinct orders of men—the lovers of freedom and the advocates of power," and in Justice Brandeis' dissent in Olmstead v. United States, 277 U. S. 438, 48 S. Ct. 564, 573, 72 L. Ed. 944, 66 A. L. R. 376: "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."

This court, functioning under a Constitution which declares that the people can abolish their own form of government (Miss. Const., Art. 3, Sec. 6; see also Herndon v. Lowry, 301 U. S. 242, 57 S. Ct. 732, 81 L. Ed. 1066), must view a conflict of mere notions with complacency. It is not unreasonable to assume that the appellant as a citizen free to express opinions of right and wrong and of policy and impolicy, and even to manifest an unwarranted pessimism in rueful prophecy, could consistently be given the floor in the forum of popular discussion to charge his accusers in turn with a form of unAmericanism which denies to him that freedom of opinion which is its identifying symbol. There have appeared in our press conscientious objections to the privileges accorded to conscientious objectors to combat service. In turn there has been outspoken and conscientious objection to those who would deny to the critics of those so exempted the right to calumniate them. The ramifications of this self-energizing process in their sum are after all only public opinion of which free speech is its genius. It has of late become current wisdom that there is such a thing as a damaging optimism which may be as justly denounced as a despairing pessimism. If the former does not slow the wheels of war industry it destroys their traction. Despair is apt to expend its last ounce of energy, while blind optimism is apt to withhold its first. The Constitution does not exact wisdom of the citizen but concedes his right to folly. That opinions weaken our war effort is no test of their legal culpability. In the recent message of the President to the seventy-

eighth Congress, he said: "But there has been some criticism based on guess-work and even on malicious falsification of fact. Such criticism created doubts and fears and weakens our total effort." The opinions and decisions of the President himself find daily dissent in the outspoken criticism of the columnist and of the advertiser.

No one should encourage the dissemination of that which tends to weaken the morale of our people. Yet a true report of military setbacks is apt to have this effect. It is an anomaly that the views of those whose high position is likely to assure universal acceptance may be expressed with a ruthless and uninhibited frankness. Dire predictions of defeat are accredited as symptoms of prophetic wisdom even though the revelations be themselves deplored. It is often those whose influence is accounted without consequence, and which therefore could be ignored, who are the favored victims of popular witchburning. The fears and mockery which their teachings foment are not unwholesome symptoms of a jealous loyalty. But the standard remains within the breast of the accuser who is apt to fall into inconsistency by seeking to pillory lesser minds not because they are hostile to the nation's welfare, but rather to the critic's views.

All the state's witnesses denied any reaction to these "teachings" except derision. Forecasts of national disaster are belied by a scorn which the witnesses considered not only deserved but applauded. No propaganda can successfully assault the reason of those whose avenues to convictions are mined with contempt. The language charged to have been used by appellant was feebly prophetic and marked by bizarre predictions whose conditional form divested them of that bold assertion which alone can dissuade opposition. The record here presented, reveals a consistent revulsion against them and belies in itself a fear of their acceptance. Yet our at-

tention has been called to no case where an expression of personal opinion, short of the advocacy of disobedience to existing law or of the violent overthrow of our government, has been the basis of a successful prosecution. Nor are we aware of any case in our state under the Act of 1942 except against members of the particular cult of which appellant is a member. Our attention has not been called to any attempt by the Post Office Department to prohibit the use of the mails to this literature nor of our Federal Bureau of Investigation to suppress this sect, whose activities, however exposed to popular disapproval, have extended back for many years.

Since disloyalty may connote language or acts which go no deeper than a disapproval or lack of sympathy with governmental policy, it lacks a reasonably definite standard of guilt. A stronger and more sinister term is found in the New Mexico statute, Laws 1919, chap. 140,—the word "revolution." Yet it was there held that since it comprises both peaceful and violent means, and only the latter may constitutionally be punished, the act was void. State v. Diamond, 27 N. M. 477, 202 P. 988, 20 A. L. R. 1527. We must not interpose our own personal sentiments, however difficult it may be to render them invisible, into a realm where compulsions must remain self-imposed.

My views have been elaborated almost to the measure of dissertation. Yet we have been confronted with an occasion where an assumption that these principles were known and read of all men would seem to have been unwarranted.

The controlling opinion would avoid the impact of the foregoing decision by designating the Act of 1942 as war emergenly legislation and deducing from this circumstance altered principles for gauging its constitutionality. No loyal citizen would contest the generality that a deplorable incident of war is the derangement of social, political, and economic life and that the emergency begets

a need for standards of conduct and exercise of restraints not applicable to times of peace. I see no reason, however, to justify a sacrifice of the freedom of speech by war when war is itself justified as a price for its maintenance. I do not gainsay the propriety, even the absolute necessity, for curbing all activities or privileges which become distorted to the point of sedition or breach of existing law. It may be that often inter arma silent leges, but courts have never recognized that in time of war the citizen must remain silent nor conscience inarticulate.

It will be found that the cases invoked to sustain the controlling view on this point deal chiefly with acts or advocacy of conduct which violates existing law, or which undermines the discipline or efficacy of our armed forces or the functioning of our military machine. Most of them involve violations of the Espionage Act of 1917 which contained positive prohibitions against definite conduct. Yet the purpose and scope of that Act is succinctly shown in 1 Bishop's Criminal Law (9 Ed.), p. 326, where it is stated: ''The purpose of the espionage act passed by Congress on June 15th, 1917, was not to suppress criticism or denunciation, truth or slander, oratory or gossip, argument or loose talk but only falsehoods wilfully put forward as true with intent to interfere with army and navy operations. Remote and secondary results not intended by the defendant, arising from a fair and truthful discussion of matters of public concern do not fall within its purview. Nor is the mere abuse of the president before a number of working-men who are not in the military service an offense against it as it does not cause insubordination, disloyalty and a mutinous spirit in the military and naval forces.'' The Act of 1942 does not define disloyalty, and it must be conceded that neither ''violence'' nor ''sabotage'' is charged. There is ''no advocacy of the cause of the enemies of the United States'' nor is any other definite act specified in the statute charged save the dissemination of literature

"which reasonably tends to create an attitude of stubborn refusal to salute . . . the flag . . . of the United States." I have taken occasion to express my views on this phase of the case in the dissenting opinion in Clem Cummings v. State, 194 Miss. 59, 11 So. (2d) 683, this day decided.

Such acts or conduct must create a clear and present danger in that by force or violence the orderly processes of government will be subverted, or that its exercise of powers for the general welfare will be so hampered as to create an imminent menace to the morals, safety, or peace of the state. The most practical standard involves the advocacy of that which is criminal or unlawful either in the end or the means. This principle was adhered to in the Stromberg, Herndon, Fiske, De Jonge, Sentner, Near, Schenck & Bridges cases, supra, in which there was outspoken advocacy of criminal syndicalism, communism, bolshevism, and other tenets universally deemed by loyal citizens as distinctly un-American. Yet so long as the advocacy of religious principles remains in the domain of mere discussion, it cannot constitutionally be punished as sedition. It must bear fruitage in an overt, hostile, or treasonable act. State v. Diamond, supra; Schoborg v. United States, 253 U. S. 494, 40 S. Ct. 586, 64 L. Ed. 1029; Com. v. Widovich, supra; Reynolds v. United States, 98 U. S. 145, 162, 25 L. Ed. 244; McKee v. State of Indiana, supra; Watson on the Constitution, vol. 2, p. 1379; Montesquieu, Spirit of Laws, vol. 1, p. 194; Schroeder, Constitutional Free Speech, pp. 412, 438.

War is an emergency chiefly because our liberties are at stake. There is neither logic nor law to support the view that these liberties must be surrendered in order to be saved. In a classic expression in Ex parte Milligan, 4 Wall. 2, 120, 18 L. Ed. 281, 295, the court said: "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times,

and under all circumstances. ' No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority.'' There are in fact certain constitutional rights which are illuminated by the fierce fires of war when those required to submit to equal responsibilities are given more patient hearing as to their asserted rights. It was stated in the address of the President to the Congress, January 7, 1943: ''In this war of survival we must keep before our minds not only the evil things we fight against but the good things we are fighting for. We fight to retain a great past and we fight to gain a greater future.'' To use the phrases of war itself, liberty may not be rationed. Nor is it expendable.

The opportunity should not be waived to call attention to other significant requirements of the statute in order that they may receive an emphasis comparable to those parts stressed to sustain conviction. The statute requires that the distribution of literature and the advocacy by speech should be done not only ''intentionally'' but the acts or words must be ''designed and calculated'' to encourage violence, sabotage or disloyalty. In passing it is well to dispel a popular notion that the law can compel loyalty; it can only punish speech or acts which operate to or are intended and calculated to produce definite and prohibited acts. ''Offenses against the espionage act are in the nature of attempts or efforts with specific intent to commit specific crimes which efforts fail though they are apparently adapted to accomplish the crime are of sufficient magnitude and proximity to the

object of their operation to be reasonably calculated to excite public fear and alarm.'' Bishop's Criminal Law, p. 327.

War does not restrict fundamental freedoms but rather enlarges the legislative field by bringing into play new laws designed to preserve the integrity of the war effort and to protect the functioning of our army and navy. But in the end the principle remains the same. Mere opinions even though beneath contempt are nevertheless above the law.

The controlling opinion, while willing to construe the language as subversive, finds its menace in its aspect as a forbidding symbol. Of what it is a symbol must be addressed to the suspicion or prescience of the individual judge. At its worst it could be symbolic only of underlying motives or subtle purposes, which, if true, means only opinions and not acts. Criminal laws never punish mere mental traits, nor even criminal intent alone. The virtual internment of appellant on such ground would be tantamount to an arrest on suspicion, or an imprisonment in default of bond to keep the peace.

Were symbols important and relevant, apt example could be found in the fact that while the fate of the appellant is being considered our Government has adopted a new design for its postage stamps, honoring the ''Four Freedoms,'' thereby symbolizing that it respects and protects the private opinions of the writer's message not only, but also blazons to the world its own defiant stand for a freedom of speech whereby the author can, if he so desire, shout his opinion from his own housetop.

The maxim, Salus republicae suprema lex est, is a slogan both of peace and of war. But it is not the safety of the people but of their liberties which is the supreme goal. It is in war especially that our people have heroically proved that liberty is of more value than life. It is only the traitor who purchases life at the cost of a people's liberty.

This court should say nothing that would encourage expressions of the type here involved. Yet I do not think that the emergency is such that even those deemed Philistines by their accusers should be destroyed by crushing both them and our liberty amid the wreckage of its own temple.

**Anderson, J.**, and **Smith, C. J.**, concur in this opinion.

**Anderson, J.**, delivered a dissenting opinion.

I join with Justices SMITH and ALEXANDER in their dissents in the Jehovah's Witnesses cases. I feel constrained, however, to add the following to the views they have expressed:

The statute involved, Chapter 178, Laws of 1942, page 211, is directed at treason against both the state and the United States. The title itself so states. There is involved here, however, only prosecution for treason against the state. The fourth paragraph of the preamble to the statute is in this language: "Whereas, All persons who either by word or deed weaken the morale or unity of our people, or adversely affect their honor and respect for the flag or government of these United States or of the State of Mississippi are a menace to the safety of this state and these United States." Section 1 of the enacting provision follows: "Section 1. Be it enacted by the Legislature of the State of Mississippi, That any person who individually, or as a member of any organization, association, or otherwise, shall intentionally preach, teach, or disseminate any teachings, creed, theory, or set of alleged principles, orally, or by means of a phonograph or other contrivance of any kind or nature, or by any other means or method, or by the distribution of any sort of literature, or written or printed matter, designed and calculated to encourage violence, sabotage, or disloyalty to the government of the United States, or the state of

Mississippi, or who by action or speech, advocates the cause of the enemies of the United States or who gives information as to the military operations, or plans of defense or military secrets of the nation or this state, by speech, letter, map or picture which would incite any sort of racial distrust, disorder, prejudices or hatreds, or which reasonably tends to create an attitude of stubborn refusal to salute, honor or respect the flag or government of the United States, or of the state of Mississippi, shall be guilty of a felony and punished by imprisonment in the state penitentiary until treaty of peace be declared by the United States but such imprisonment shall not exceed ten years.''

The Constitution of the state, Section 10, defines treason against the state and the evidence necessary to convict of the crime in this language: ''Treason against the state shall consist only in levying war against the same or in adhering to its enemies, giving them aid and comfort. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court.'' That is exactly the same language used in Article 3, Section 3 of the Constitution of the United States except the words ''United States'' in place of the words ''the state.'' Insurrection, sedition, sabotage and syndicalism are merely elements which go to make up treason. 33 C. J., page 159, Sections 4, 12, 13 and 14. When the proposition is squarely presented to the Supreme Court of the United States my opinion is that court should and will hold that the constitutional definition of treason can neither be added to or taken from by legislation; that the constitutional definition is complete and exclusive. The early lower federal court decisions so held without exception. See United States v. Burr, C. C. Va. 1807, 25 Fed. Cas., pages 2, 13, Fed. Cas. No. 14692a, 4 Cranch 455 Append. In that case the court said, ''The people . . . have refused to trust the national legislature with the definition

of [the crime of treason]." United States v. Greathouse, C. C. Cal. 1863, 26 Fed. Cas., page 18, No. 15254, 4 Sawy. 457; United States v. Werner, D. C., 1918, 247 F. 708. A mere conspiracy to overthrow the Government, however atrocious, does not of itself constitute treason. "The intention and the act, the will and the deed, must concur." United States v. Mitchell, C. C. 1795, 2 Dall. 348, 355, 1 L. Ed. 410, 26 Fed. Cas., page 1277, No. 15,788; United States v. Fricke, D. C. 1919, 259 F. 673. Mere words, oral, written or printed, however treasonable, do not constitute an overt act of treason within the definition of the crime. In re Charge to Grand Jury, 30 Fed. Cas., page 1034, No. 18,271, 5 Blatchf. 549; In re Charge to Grand Jury, 30 Fed. Cas., page 1036, No. 18,272, 1 Bond 609. War can only be levied by the employment of actual force. "Troops must be embodied, men must be assembled, in order to levy war." United States v. Burr, supra. (These cases digested in U. S. C. A., Title 18, sec. 1, pages 5-8, inclusive.)

Under Article 5 of the Constitution of the United States, that instrument can be amended, changed or repealed in its entirety, and another Constitution adopted, provided the proposal is properly made and ratified by the legislatures of three-fourths of the United States. In other words, the Federal Government is given power, to be exercised in the manner provided by that article, to legally repeal the Constitution in whole or in part, and if repealed in whole, adopt another of any kind or character whatsoever. In other words, our Democracy could legally "commit suicide." It could adopt a dictatorship in its place. This could not, however, be brought about by force of arms. The change would have to be by peaceful means. But it would be permissible for private individuals, public assemblages and public press and otherwise to advocate the change. Provided, of course, the limit would be treason against the Government, as defined by the Constitution.

It is true that the constitutional war powers of the Congress, as provided in paragraphs 1-16, inclusive, of Article 1, section 8, are large. And in order to successfully conduct a war many constitutional provisions may be ignored, but not all of them. The freedom of speech, freedom of religion, and freedom of the press, the three most outstanding constitutional rights, are not entirely wiped out for the purposes of war. Suppose Congress should declare that the doctrines of a certain religious organization are hampering the country's war efforts and make it a crime to further advocate them. Would the members of the society have to lay aside and repudiate their religion during the war? Suppose Congress should declare that neither by word of mouth nor by means of the public press the conduct of the war should be criticized, and make it a crime so to do. In my opinion those three fundamentals cannot be abridged to any extent in time of peace, and very little, if any, in time of war. In the past the attempt to destroy any religious sect has resulted in its permanent establishment and growth. Take, for illustration, the Mormon religion—the founder, Smith, was assassinated on account of his religion. The members, to a large extent, were driven out of the east into the new west; and now in the state of Utah it is the outstanding religion of that state, with many times more members than any other religious organization.

What has been written above applies as well to the case of Clem Cummings v. State, supra, this date decided.

**Smith, C. J.**, delivered a dissenting opinion.

The indictment in this case contains only one count and charges the appellant with violating not the whole of Chapter 178, Laws of 1942, but with violating the "disloyalty" and the "respect for the flag" provisions thereof, two distinct crimes which should have been

charged in separate counts, but no objection has been made thereto by the appellant. The punishment prescribed by this statute is "imprisonment in the state penitentiary until treaty of peace be declared by the United States, but such imprisonment shall not exceed ten years;" and this appellant was sentenced accordingly. I will put aside this indeterminate sentence provision of the statute which in effect is but a variation of concentration camp confinement for the duration of the war, and will express no opinion thereon.

I concur in all that Justice ALEXANDER has said, but it may not be amiss for me to specifically set forth two of the reasons why I think the disloyalty provision of this statute is constitutionally invalid. 1. As Justice ALEXANDER has pointed out, a sufficiently ascertainable standard of "guilt" can not be found in the word "disloyalty" to satisfy the requirements of due process of law. 2. As my affirming associates admit, for the statute to be constitutionally valid it must be within—must not exceed—the state's war power. This power exists only when the nation is at war and is to enact legislation in aid of the prosecution of the war or to prevent the obstruction of its successful prosecution. Article I, Section 8, Clause 11, and Section 10 of our National Constitution; Gilbert v. State of Minn., 254 U. S. 325, 41 S. Ct. 125, 65 L. Ed. 287; 16 C. J. S., Constitutional Law, sec. 213, page 631. The disloyalty to the State or Nation condemned in this statute is not limited therein to such as may adversely affect the prosecution of this war but covers all such disloyalty whether it affects the prosecution of the war or not, and therefore is in excess of the state's war power.

I cannot close this opinion without saying that I am at a loss to perceive how the successful prosecution of the war in which we are now engaged can be so obstructed by such things as this appellant here said and did as to justify depriving our people of the blessing of the

freedom they have enjoyed since our national constitution was adopted to believe, write and say what they pleased as to the policies and conduct of their state and national governments. I may not, and do not, believe what this appellant is teaching and I unhesitatingly say that until we have won this war he should refrain therefrom, but nevertheless he had the constitutional right to say and do what he here said and did. It would be well for us to pause in our prosecutions of the members of this misguided but war harmless sect (Jehovah's Witnesses) and ponder the wise words of Madariaga, quoted by the late Lord Tweedmuir in "Pilgrim's Way," page 222: A democracy that goes to war, if beaten, loses its liberty at the hands of its adversary; if victorious it loses its liberty at its own hands," and be warned thereby that if we are not to lose our liberty in winning this war, we must be careful to sacrifice it for the time being only to the extent necessary to enable us to fight the war.

**Alexander** and **Anderson, JJ.,** concur in this opinion.